COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Causey and Chaney
Argued by videoconference

TERESA MARY MAUST

MEMORANDUM OPINION* BY
v.        Record No. 0505-21-4            JUDGE VERNIDA R. CHANEY
                                          AUGUST 9, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge[1]

Andrew J. Cornick (Andrew J. Cornick, LLC, on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Mark R.
Herring,[2] Attorney General, on brief), for appellee.


Teresa Mary Maust ("Maust") appeals from the judgment of the Circuit Court of Stafford

County ("trial court") convicting and sentencing her for felony distribution of a Schedule I or II

controlled substance, in violation of Code § 18.2-248.  Maust was sentenced to confinement for a

period of five years with all but three months suspended for five years.  On appeal, Maust

contends that the trial court erred as a matter of law in finding that the circumstantial evidence

reasonably excluded Maust's hypothesis of innocence and proved beyond a reasonable doubt that

Maust distributed oxymorphone on October 1, 2018.  For the following reasons, this Court

reverses the trial court's judgment.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication

[1] Judge J. Bruce Strickland entered the final sentencing order in this case.  Judge Charles
S. Sharp conducted Maust's trial, found her guilty, and entered the conviction order.

[2] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

UNPUBLISHED

## I. BACKGROUND

### A. The Investigation of Maust

#### i. *Staging the Investigation*

On October 1, 2018, at around 5:00 p.m., Stafford County Detective Shawn Monaghan ("the detective") met with Robert Gale ("Gale"), a paid informant, at a "staging area" in a commuter parking lot to conduct a narcotics investigation.[3] Maust was the target of the investigation. Gale was a drug addict whose "drug of choice" was opiates. Gale was also a convicted felon with a lengthy criminal record.

The detective instructed Gale to drive to Maust's residence and purchase opioid pills from her with "buy money" from the sheriff's department. The detective gave Gale $300 to buy three opioid pills at $100 per pill, plus an additional $20 because Gale said he owed Maust $16. Before the detective gave the buy money to Gale, the detective recorded the denominations and serial numbers.

The detective searched Gale's person and vehicle for drugs and money to ensure that he was not bringing any drugs or other money to Maust's residence. The detective equipped Gale with an on-person audio recording device and followed Gale's vehicle to and from Maust's residence in Stafford County. However, the detective was unable to hear live audio of Gale's activities and communications.

While following Gale, the detective lost sight of him after he drove up the driveway to Maust's house. The detective could not see Gale's vehicle at the end of the driveway, nor could he see Gale enter or exit Maust's house. The detective observed other cars in the driveway. The detective did not recall whether there were any cars in the garage. The detective maintained a

---

[3] Gale had previously acted as a police informant to "work off charges." On this day, the police were paying Gale for his informant work. When he worked for money, the police usually paid Gale $100 per investigation.

physical distance from Maust's residence to avoid being seen by anyone in Maust's house. The detective testified that he did not know how many people were in Maust's house while Gale was there on October 1, 2018.

ii. *The Evidence Recovered from Gale*

The audio recording recovered from Gale recorded Gale talking with an unidentified person ("Gale's companion") who was in the car with Gale after 5:00 p.m. during the drive to and from Maust's house. During the recorded conversation, Gale mentioned that he and his companion had also been driving together in the car that morning.[4] During the drive to Maust's house, a few minutes before Gale arrived there, Gale instructed his companion, "Text her and say here." There is no evidence of the whereabouts of Gale's companion while Gale was inside Maust's house.

Gale's recorded conversation with Maust began with a greeting and promptly turned to the subject of appliances that Maust was selling from her home. Gale told Maust to "hold on for a second," and he apparently went to his car to retrieve the money.

When Gale returned, he said, "I owe you the fourteen dollars. Do you have change?" After Maust and Gale both commented on the "old style" of the bills, Maust replied, "two forty and four." Gale responded, "Ok." Then Maust and Gale resumed discussion of the appliances that Maust was selling.

Following some static and garbled transmission on the audio recording, Gale was recorded exchanging greetings with an unidentified person.

Maust and Gale continued to discuss the appliances for sale, and Maust told Gale they were being sold "first come, first served." As Gale took pictures of the appliances, Maust said,

---

[4] Gale commented on a noise from the car and told his companion, "Remember, we were hearing it this morning."

- 3 -

"I owe you six bucks, right? You owe me two fifty four." Gale replied, "Sixteen." Maust responded, "Two fifty four. And you gave me two seventy."

When Gale finished taking pictures of the appliances, the voice of another woman was recorded. Maust and Gale continued to talk about the price of the appliances. Maust told Gale that she would let people take whatever was left after she removed what she wanted. When Maust asked Gale to give her a second, Gale said he would wait outside. Then the aforementioned woman's voice is heard again on the recording.

The audio recording indicates that Maust rejoined Gale about two minutes after Gale said he would wait outside. Maust told Gale that the appliances would likely sell quickly and suggested that Gale's mother might want them. Gale replied that both his mother and sister may be interested in the appliances.

About ten minutes after Gale drove up Maust's driveway, Gale drove out of the driveway and back to the commuter lot, making no unscheduled stops. On the drive back, Gale was recorded telling his companion about the appliances that Maust was selling. The detective followed Gale's car back to the commuter lot where he again met with Gale.

The detective retrieved the audio recording device from Gale and again searched his person and vehicle. Gale did not have any of the buy money, but he did have $16 in cash which was not part of the buy money. Gale also turned over three round orange tablets imprinted with "G74." Subsequently, one of these pills was analyzed by the Virginia Department of Forensic Science ("DFS") and "was found to contain Oxymorphone, [a] Schedule II [controlled substance]." Based on visual examination of the other two pills, DFS concluded that their shape, color, and manufacturer's markings were "consistent with a pharmaceutical preparation containing Oxymorphone."

### iii. *The Search of Maust's House*

The next day, on October 2, 2018, the detective executed a search warrant at Maust's house. The police found numerous pills, a pill press or pill crusher, and "numerous prescription bottles for different narcotics, the majority of which were empty." Some pills that were found were prescribed to Maust and others were prescribed to her tenant, Susan Stone.

While the search of Maust's house was underway, Maust arrived home with Ms. Stone. Maust gave the detective the combination to a safe that was found in her bedroom. The detective did not find out whether any other occupants of the house knew the combination to the safe.

Maust told the detective that she got the safe to keep her ex-husband away from her money. Maust said that she had withdrawn money from her bank account and placed it in the safe because she was planning to move. Maust also stated that some money in the safe may have been money that Gale had borrowed and repaid to her.

The police found $4,351 in the safe, including $270 of the buy money given to Gale. The detective testified that "there was sixteen one hundred dollar bills, there were twenty-seven fifty dollar bills, there were fifty-nine twenty dollar bills, there were eighteen ten dollar bills, there were [eight five] dollar bills, and there was one one dollar bill which totaled up to four thousand, three hundred and fifty-one." The police found an additional $138 elsewhere in Maust's bedroom.

All the money found in the safe was inside an envelope that had writing on it. The writing on the envelope included the following notations, arranged in a column: "B = 11," "G = 17," "J = 121," "H = 25," and "L = 19." To the right of this list was a column of numbers: "1100,[5] 850, 2420, 250, 95, 4710." The first five of these numbers in the column appeared

---

[5] On Commonwealth's Exhibit 3, the top portion of the first number in the second column is obscured by an evidence sticker, but the number appears to be "1100."

above a horizontal line and the last number was below the line. In the detective's testimony, he characterized the writing on the envelope as an "owe sheet" which is used to keep track of drugs given out on credit. The detective also testified that the numbers next to the letters could represent pills or money.

Maust testified that the writings on the envelope were a record of her prior count of the money in the envelope. Maust explained that each letter represented the denomination of the bills, e.g., B for Benjamin, H for Hamilton, and L for Lincoln.[6] Maust testified that the second column was the tally of the money.

iv. *Maust's Additional Statements and Testimony*

When the detective interviewed Maust during the search on October 2, 2018, Maust stated that the residents of her house included herself, her two adult sons, and Susan Stone. Maust initially denied any involvement in narcotics dealing. Maust told the detective that she had legitimate prescriptions for an injury. Maust stated that her ex-husband would steal and sell the pills prescribed to her, but she acknowledged that her ex-husband had moved out the month before. Maust admitted that sometimes she lends pills to her friends if they run out, but she denied selling pills. The detective informed Maust that such distribution of controlled substances is also illegal. In response to the detective's statement that "we purchased these pills," Maust replied that any money she received from Gale was for payment of a debt. Maust stated, "I don't know why you're bothering me, he's a way bigger dealer than I am."

At trial, Maust testified that Gale rarely came to her home since she and Gale stopped dating. Maust testified that on October 1, 2018, Gale came to her house to look at appliances

---

[6] Maust testified that she only used the method of counting bills by denominations once out of boredom a year and a half ago and that she "would have to actually look at the bills to tell you what it meant." The record indicates that Maust was not shown bills in the different denominations to refresh her recollection.

that she was selling and to give her "a down payment for a pancake compressor and a framing nail gun." Maust testified that Gale also paid her back around $150 that he had borrowed. Maust acknowledged that the audio recording from Gale recorded Maust indicating that she received $270 from Gale.

Maust testified that she did not sell drugs to Gale on October 1, 2018. Maust also testified that when Gale was in her house that day, she did not recall "exactly everybody that was in the house," but she believed that several others were there, including her oldest son and two other tenants, Stone and Matt Herbigg. Maust identified Susan Stone's voice as the other female voice on the audio recording from Gale. Maust testified that every time Gale came over, he would have a private conversation with Susan Stone, but she could not recall whether Gale met separately with Ms. Stone on October 1, 2018. Maust testified that she did not see Gale take three pills from anywhere in the residence.

v. *No Testimony from Informant Gale*

Gale died before Maust's bench trial in February 2020.

B. The Trial Court's Findings

At trial, the trial court made the following findings on the record:

- No contraband was uncovered when the police initially searched Gale, and the searching protocol was sufficient to have made that judgment.

- Gale "went into the home occupied by Ms. Maust, and for a period of approximately ten minutes was inside the house."

- The audio recording recovered from Gale sounded "very garbled." At various points while the recording was played at trial, the trial court noted that nothing could be heard.

- The recorded conversation included discussion about a washer and dryer.

- The audio recording included "what purports to be an exchange of money."

- Maust's voice was identified on the recording "engaged in some kind of financial transaction, there's an exchange of money inside her house."

- 7 -

- "As a consequence of the audio, the only substantive conversation between any two people in the house was that between the informant and Ms. Maust, whose voice was identified by the officer."

- "In the course of the relatively garbled transmission, one thing is clear, that at some point there was an exchange of cash money."

- After Gale left Maust's house, "upon subsequent search by the officer discovered (a) no longer to have that buy money and (b) to have in his possession three pills which are without dispute contraband[,] . . . [i.e.,] opioids . . . ."

- "[T]he Court has before it a period of ten minutes in which there was an exchange of money and drugs, and the only evidence of contact between any two persons is that between the informant, who's no longer with us, and Ms. Maust."

- "A subsequent search warrant being executed, the money that was distributed or given to the informant and then later handed over presumably to Ms. Maust was found in a safe to which [other people] ha[ve] relatively little access, or rather it's limited to other people."

- When Maust's counsel attempted to argue that the initials on the purported owe sheet represent denominations of United States currency, the trial court interrupted her closing argument stating, "Ms. Coleman, nobody does that."

- "The only reasonable inference to be drawn from that set of circumstances is that the transaction went down exactly as has been argued by the Commonwealth. And whether she gave, sold, distributed at a discount, or whatever the case may be, the Court is convinced beyond any reasonable doubt that the Commonwealth has met its burden."

The trial court found Maust guilty of distribution as charged in the indictment. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

On appellate review of a criminal conviction, this Court "consider[s] the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." *Pooler v. Commonwealth*, 71 Va. App. 214, 218 (2019) (quoting *Williams v. Commonwealth*, 49 Va. App. 439, 442 (2007) (*en banc*)). We "discard the evidence of the accused *in conflict* with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn

- 8 -

therefrom." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (emphasis added) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)). The conviction will be affirmed "unless it is plainly wrong or without evidence to support it." *Sarka v. Commonwealth*, 73 Va. App. 56, 62 (2021) (quoting *Austin v. Commonwealth*, 60 Va. App. 60, 65 (2012)).

"[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." *Wright v. Commonwealth*, 292 Va. 386, 397 (2016) (alterations in original) (quoting *Commonwealth v. Smith*, 259 Va. 780, 782 (2000)).

"[W]here, as here, a conviction is based on circumstantial evidence, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'" *Garland v. Commonwealth*, 225 Va. 182, 184 (1983) (quoting *Carter v. Commonwealth*, 223 Va. 528, 532 (1982)). "While a conviction may properly be based upon circumstantial evidence, suspicion or even probability of guilt is not sufficient." *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971); *see also Wright*, 292 Va. at 397 ("evidence that raises no more than a suspicion of guilt 'no matter how strong, is insufficient to sustain a criminal conviction'" (quoting *Stover v. Commonwealth*, 222 Va. 618, 624 (1981))).

To establish proof beyond a reasonable doubt, "the *chain of necessary circumstances must be unbroken* and the evidence as a whole must satisfy the guarded judgment that both the *corpus delicti* and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty." *Wright*, 292 Va. at 397 (quoting *LaPrade v. Commonwealth*, 191 Va. 410, 418 (1950)). Proof of a mere opportunity to commit an offense provides only "the suspicion that the defendant may have been the guilty agent; and suspicion is never enough to sustain a conviction." *Simmons v. Commonwealth*, 208 Va. 778, 783 (1968).

B. Insufficient Evidence of Drug Distribution by Maust to the Paid Informant

The Commonwealth's case against Maust did not include any witness testimony identifying Maust as the source of the oxymorphone pills recovered from Gale, the paid informant who died before trial. To sustain a conviction for drug distribution under these circumstances where the Commonwealth relies on circumstantial evidence, the Commonwealth's evidence must show that the informant "*could not have obtained the [controlled substance] from a source other than the defendant.*" *Jones v. Commonwealth*, 21 Va. App. 435, 443 (1995) (*en banc*) (emphasis added). Absent a showing that Gale had no opportunity to obtain the controlled substance from someone other than Maust, there is a fatal break in the chain of necessary circumstances and the evidence fails to prove beyond a reasonable doubt that Maust distributed the oxymorphone pills to Gale.

In *Jones*, this Court considered whether the evidence was sufficient to support the defendant's conviction for cocaine distribution where the police informant who allegedly bought cocaine from the defendant was unable to testify about the alleged drug purchase. *Id.* at 440. We concluded that "[t]he circumstantial evidence in this case points unerringly to the fact that [the defendant] was the person who sold cocaine to [the police informant]." *Id.* at 442. The following facts supported this conclusion: A meeting between the defendant and a police informant was arranged "for the purpose of purchasing drugs." *Id.* at 444. A police officer ("Officer A") searched the informant to confirm that he did not already possess drugs. *See id.* Officer A, accompanied by another police officer ("Officer B"), transported the informant close to the place where the informant and the defendant planned to meet. *See id.* The informant left Officer A's police vehicle and walked for a short time when another police officer ("Officer C") observed the informant enter the defendant's car along with the defendant. *See id.* Officer C continuously observed the informant until he left the defendant's car two minutes later and

walked back toward the police vehicle where Officers A and B were waiting for him. *See id.* A fourth police officer ("Officer D") observed the defendant drive alone into the parking lot where he met the informant. *See id.* at 439. Officer D observed the informant meet the defendant and momentarily lost sight of them before he saw them enter the defendant's car together. *See id.* at 439, 442-43. The informant "had neither the time nor the opportunity to purchase the drugs while en route to the designated site and then back" to Officer A's police vehicle. *Id.* at 443. Officer A recovered two bags of cocaine from the informant when he returned to the police vehicle after meeting with the defendant. *Id.* at 438. Based on these facts, this Court concluded that "the evidence shows that [the informant] *could not have obtained the cocaine from a source other than the defendant.*" *Id.* (emphasis added). Therefore, we held in *Jones* that the circumstantial evidence established that the informant obtained the illegal drugs from the defendant. *See id.* at 444.

As in this appeal, the defendant in *Bennett v. Commonwealth*, 69 Va. App. 475 (2018), appealed his conviction for distributing illegal drugs to an informant who died before the defendant's trial. This Court found that the following evidence was sufficient to support the defendant's conviction: "[T]he informant made advance arrangements for the transaction directly with the appellant." *Id.* at 493. Before the transaction, the police investigators searched the informant and his vehicle to confirm that he had no drugs. *See id.* at 480. The investigators maintained visual surveillance of the informant until he drove into the apartment complex where the informant met with the defendant. *See id.* at 481. The investigators monitored the drug purchase with a "live" audio feed and made separate audio and video recordings of the transaction. *See id.* at 480. The video depicted the in-person drug transaction between the informant and the defendant. *See id.* at 481-82. Apart from "a fleeting view" of someone in the

first part of the video, "the only people visible in the recording are the informant and the appellant, the person he asked to sell him the drugs." *See id.* at 495.

Here, in contrast with *Jones* and *Bennett*, the circumstantial evidence fails to establish that the informant, Gale, could not have obtained the illegal drugs from someone other than the appellant, Maust. Moreover, the circumstantial evidence fails to establish that Gale obtained the illegal drugs from Maust. The purpose of the detective's initial search of Gale and his car was defeated when an unidentified person accompanied Gale while he drove to and from Maust's house. Although the detective's initial search of Gale and his car may support the trial court's finding that Gale possessed no pills before he drove to Maust's house, there is no evidence that the police searched Gale's unidentified companion. Therefore, there is no evidentiary basis for excluding Gale's companion as the source of the pills recovered from Gale.

In further contrast with *Jones* and *Bennett*, the evidence here also fails to show that the informant could not have obtained the pills from a source other than the defendant at the place where the alleged drug transaction occurred. The audio recording shows that while Gale was in Maust's house, at least two persons other than Maust were also there. In addition to the female voice that Maust identified as her tenant, Ms. Stone, a male voice was recorded exchanging greetings with Gale. The audio recording also indicates that Gale was away from Maust for approximately two minutes while he was there. The evidence does not show that Gale could not have covertly accessed some of the narcotic pills prescribed to Maust or Ms. Stone. Nor is there any evidence regarding the whereabouts of Gale's companion while Gale was inside Maust's house. Taking all of this evidence in the light most favorable to the Commonwealth, the evidence does not point unerringly to Maust as the source of the pills recovered from Gale.

The instant case is further distinguished from *Jones* and *Bennett* because the evidence here failed to establish that Maust met with Gale on the alleged date of offense for the purpose of

distributing drugs to him. *See Jones*, 21 Va. App. at 444 (A meeting between the defendant and the police informant was arranged "for the purpose of purchasing drugs."); *see also Bennett*, 69 Va. App. at 493 ("[T]he informant made advance arrangements for the [drug purchase] transaction directly with the appellant."). Here, the informant made no advance arrangements with Maust to purchase drugs from her. The Commonwealth's evidence failed to exclude the reasonable hypothesis of innocence that Maust met with Gale for the purpose of showing him various appliances and other items that she was selling in anticipation of her move to a smaller home.[7] Throughout Maust's and Gale's recorded conversation, they discussed the appliances that Maust was selling on a "first-come, first served" basis.

The Commonwealth's evidence also failed to prove that the financial transaction between Maust and Gale involved the distribution of drugs. Maust stated in the audio recording that Gale "owed" her "two fifty-four" and gave her "two seventy." Gale confirmed that he owed Maust $254 and had given her $270 when he replied that Maust owed him $16 in change. The evidence does not establish that the money was used to purchase drugs rather than to repay Maust for a personal loan or to make a legal purchase from Maust's "moving sale."[8] The Commonwealth's evidence failed to exclude these reasonable hypotheses of innocence.[9] Moreover, the recorded

---

[7] The hypothesis of innocence that Maust met with Gale to show him appliances that she was selling flows from the audio recording that Gale covertly recorded.

[8] These hypotheses of innocence flow from the audio recording—the Commonwealth's own evidence. Recognizing these hypotheses of innocence as reasonable does not require any credibility determinations in Maust's favor.

[9] The Commonwealth's evidence also failed to exclude Maust's innocent explanation for the document that the detective interpreted as an "owe sheet." Because the evidence demonstrably supports Maust's innocent explanation that the notations record a count of dollar bills by denomination, the trial court erred by arbitrarily rejecting Maust's innocent explanation and adopting the detective's incriminating interpretation. *See Wright*, 292 Va. at 397 ("[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." (alterations in original) (quoting *Smith*, 259 Va. at 782)).

transaction is not consistent with Gale's supposed plan to pay $300 for three pills.[10]  Therefore, the trial court's finding that the audio recording established "an exchange of money and drugs" is without sufficient evidence to support it.[11]

Because the chain of necessary circumstances to prove the alleged act of drug distribution to Gale was repeatedly broken when Gale had opportunities to obtain pills from sources other than Maust, the *corpus delicti* and the criminal agency of the accused have not been proved to the exclusion of any other rational hypothesis and to a moral certainty.  *See Wright*, 292 Va. at 397.  Therefore, the Commonwealth's circumstantial evidence is insufficient to support Maust's conviction.

## III.  CONCLUSION

The Commonwealth's wholly circumstantial evidence is insufficient to exclude the reasonable hypothesis of innocence that the police informant obtained the oxymorphone pills from a source other than Maust.[12]  Therefore, the evidence failed to prove beyond a reasonable doubt that Maust unlawfully distributed a Schedule II controlled substance on October 1, 2018,

---

[10] The detective expected Gale to buy three oxymorphone pills at $100 per pill and to repay Maust $20.  According to the audio recording, Gale gave Maust $270 and received $16 in change.  After paying Maust $254, Gale should have returned $66 to the detective, but returned only $16.

[11] Maust was not on trial for being a drug dealer, but for distributing to Gale the oxymorphone pills recovered from him on October 1, 2018.  The dissent includes much discussion of evidence that Maust distributed drugs to Gale or other persons on prior occasions.  However, neither the Virginia Supreme Court nor this Court has ever held that proof that a defendant is a drug dealer justifies the inference that the defendant sold drugs to a particular individual on a specific date as charged.

[12] The dissent contends that the Commonwealth is not required to negate the possibility that the informant obtained the illegal drugs from someone other than Maust.  However, when the Commonwealth relies on wholly circumstantial evidence to prove an act of drug distribution, the Commonwealth's means of proof is by process of elimination.  A rational fact-finder cannot infer that Gale obtained the illegal drugs from Maust unless the evidence establishes that Gale had no opportunity to obtain the illegal drugs from another source.  *See Jones*, 21 Va. App. at 443.

in violation of Code § 18.2-248.  Accordingly, the Court hereby reverses the trial court's

judgment, vacates the conviction and sentencing orders, and dismisses the indictment.

*Reversed and final judgment.*

Malveaux, J., dissenting.

The majority holds that the evidence was insufficient to convict appellant for distribution of a Schedule I or II controlled substance based on the totality of the circumstantial evidence presented at trial. I respectfully disagree. Given the deference we owe the trial court as fact finder and the fact that the evidence, properly viewed, was sufficient to support appellant's conviction, I respectfully dissent.

"In accordance with established principles of appellate review for a sufficiency of the evidence case, we view the 'evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court.'" *Peters v. Commonwealth*, 72 Va. App. 378, 383 (2020) (quoting *Riner v. Commonwealth*, 268 Va. 296, 330 (2004)). Therefore, we will "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction,

- 16 -

'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Where a controlled purchase of drugs is concerned, 'without [the informant's] testimony, the evidence proving that the [drugs] came from the defendant" may be "purely circumstantial.'" *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018) (alterations in original) (quoting *Jones v. Commonwealth*, 21 Va. App. 435, 441-42 (1995) (*en banc*)). However, "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence, provided that [it] is sufficiently convincing." *Pijor*, 294 Va. at 512 (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Id.* at 512-13 (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Our review "does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

Applying these standards, I conclude that a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support a conviction for distribution of a Schedule I or II controlled substance. In the instant case, the Commonwealth's evidence, viewed in the light most favorable to it, demonstrated that Gale went to appellant's residence with the buy money Detective Monaghan provided and the intention of buying oxymorphone pills from appellant. After arriving, Gale gave the money to appellant and returned ten minutes later with three orange oxymorphone pills. Although Monaghan did not witness the transaction, the recording demonstrated that Gale interacted with appellant, and she verbally confirmed that he

gave her money. Moreover, Monaghan followed Gale to and from appellant's house and searched him before and after the transaction.

Appellant admitted to having a prescription for oxymorphone, and she described the pills as orange in color to police.

During a search of Maust's house, police found "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. Police found $4,351 in a safe in appellant's bedroom, including $270 of the buy money given to Gale. *See White v. Commonwealth*, 24 Va. App. 446, 453 (1997) ("Considered with other factors, possession of currency by a defendant may be considered in determining whether he or she possessed drugs with an intent to distribute.").

In addition, it is well-established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). Moreover, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

At trial, appellant testified that Gale repaid a debt he owed her and made a down payment on certain tools. She also testified that she had been receiving rent from as many as eight people living with her, "between three hundred and six hundred" dollars, including from her "own children." That testimony, however, was contradicted by appellant's statements to Monaghan

- 18 -

the day after the controlled buy, when she made no mention of rental income or of Gale making a down payment on tools and claimed the rest of the money found in the safe was money she had withdrawn from her bank in preparation for finding a new place to live. Appellant also told Monaghan that only four people lived in the house—herself, her two sons, and a woman named Sue.

Moreover, although appellant repeatedly denied that she sold any contraband, she implied the opposite by stating that Gale "comes to me when he wants them" and that he "sells more than I do." The evidence also established that an individual named Greg Murphy was sending appellant text messages about "getting pills." Further, when Monaghan told appellant that two of her pills were found on Sue, appellant first claimed that she only gave the pills to Sue so that Sue could give them back later when appellant needed them. She then admitted that she gave pills to Sue for Sue's own use but claimed that she did so only because Sue had a prescription for the same pills.

The record thoroughly demonstrates that appellant provided vague, inconsistent, and contradictory explanations for the presence of the cash in her safe and whether she distributed pills to others. "[A] fact-finder, having rejected a defendant's attempted explanation as untrue, may draw the reasonable inference that [her] explanation was made falsely in an effort to conceal [her] guilt." *Covil v. Commonwealth*, 268 Va. 692, 696 (2004). I would accept the trial court's credibility determination, as it was neither plainly wrong nor without evidentiary support.

Finally, the potential presence of an unidentified person in the car with Gale[13] and of other women at appellant's house do not undermine the Commonwealth's evidence. The majority contends that, due to the presence of these other individuals, the circumstantial evidence

---

[13] At trial, Monaghan did not recall Gale's girlfriend, Tiffany Love, accompanying Gale, but an unidentified person can be heard conversing with Gale during the drive to and from appellant's house.

- 19 -

fails to establish that Gale could not have obtained the oxymorphone pills from someone other than Maust.

The majority correctly notes that to sustain a conviction for drug distribution, where the Commonwealth relies on circumstantial evidence, "[t]here must be an unbroken chain of circumstances 'proving the guilt of the accused to the exclusion of any other rational hypothesis and to a moral certainty.'" *Jones*, 21 Va. App. at 442 (quoting *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971)). "However, 'the theory of innocence must flow from the evidence, and not from the ruminations of defense counsel.'" *Id.* (quoting *Mullis v. Commonwealth*, 3 Va. App. 564, 574 (1987)). The Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson v. Commonwealth*, 281 Va. 212, 218 (2011). "Whether [a] hypothesis of innocence is reasonable is itself a 'question of fact' subject to deferential appellate review." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *White v. Commonwealth*, 68 Va. App. 241, 252 (2017) (quoting *Vasquez*, 291 Va. at 250). "In practical terms, this means that—even if not '*inherently incredible*'—a defendant's exculpatory version of events need not be accepted by the factfinder." *Tizon v. Commonwealth*, 60 Va. App. 1, 12-13 (2012) (quoting *Montgomery v. Commonwealth*, 221 Va. 188, 190 (1980)).

Here, the trial court rejected appellant's theory that Gale received the pills from someone other than appellant, and instead found the evidence sufficient despite its circumstantial nature. Thus, the question on appeal is whether a rational fact finder, in light of all the evidence, could have rejected appellant's theories of innocence and found her guilty beyond a reasonable doubt.

*See Moseley*, 293 Va. at 464. I find that the evidence supports the finding that a reasonable fact finder could have rejected appellant's hypothesis of innocence and instead found that the evidence demonstrated an unbroken chain of circumstances proving appellant's guilt. Monaghan testified that he searched Gale and his vehicle prior to the controlled purchase, and Gale and his vehicle were free of contraband and other currency besides the buy money. Monaghan then followed Gale to Maust's residence without any unscheduled stops, observed Gale drive onto the driveway of Maust's residence, and, after approximately ten minutes, followed Gale back to the staging area without any unscheduled stops. On the recording, appellant verbally confirmed that Gale gave her money. It was, therefore, reasonable for the court to infer that the exchange of money was Gale purchasing the three oxymorphone pills from Maust. That inference is strengthened by the fact that Monaghan recovered none of the buy money—but did recover the three pills—from Gale following the transaction, and further strengthened both by what police found in appellant's residence and by her inconsistent statements.

Appellant does not point to any evidence that the unidentified woman in the car or another woman supplied Gale with the pills. Indeed, the evidence demonstrated that Gale spoke only to appellant while at her house.[14] Further, there was nothing in the conversation between the woman in the car and Gale suggesting that the woman provided Gale with any illicit contraband on the drive to or from appellant's home. The Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson*, 281 Va. at 218. The trial court concluded that the only reasonable inference from the circumstances before it was that Gale and appellant exchanged the buy money and the pills, and thus necessarily found that appellant's hypothesis of innocence was unreasonable.

---

[14] At one point on the recording, it appears that Gale says "hey" to another woman, but he did not have any additional conversation with her.

Based on our standards of review as an appellate court, which include both viewing the evidence in the light most favorable to the Commonwealth and deferring to the trial court's determinations as to findings of fact and credibility, I would hold that the evidence was sufficient to sustain appellant's conviction for distribution of a Schedule I or II controlled substance. Therefore, I would affirm the judgment of the trial court.[15]

---

[15] The majority cites to *Jones*, 21 Va. App. 435, and *Bennett*, 69 Va. App. 475, as support for its contention that the evidence in this case was not sufficient to support appellant's conviction. However, while there may have been additional circumstances supporting the defendants' convictions for drug distribution without the testimony of the confidential informant in those cases, that does not render the circumstances in this case inherently insufficient to support appellant's conviction. Rather, all circumstantial evidence cases are decided on the specific facts unique to each case.

In addition, we cited to, and the majority heavily relies on, the language in *Jones* that "[t]here must be an unbroken chain of circumstances 'proving the guilt of the accused to the exclusion of any other rational hypothesis and to a moral certainty.'" *Jones*, 21 Va. App. at 442 (quoting *Gordon*, 212 Va. at 300). However, as noted above, this principle is not to be viewed in isolation—rather, nothing in *Jones* alters the well-established principles regarding the trial court's ability to determine whether a defendant's hypothesis of innocence is reasonable, a finding that "is itself a 'question of fact' subject to deferential appellate review." *Haskins*, 44 Va. App. at 9 (quoting *Emerson*, 43 Va. App. at 277).