COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Lorish
Argued at Richmond, Virginia


FRANKLIN JEROME COLEMAN, JR.

                                                    MEMORANDUM OPINION* BY
v.         Record No. 0584-23-2              CHIEF JUDGE MARLA GRAFF DECKER
                                                         AUGUST 20, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
Joseph M. Teefey, Jr., Judge

Kevin E. Calhoun for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Franklin Jerome Coleman, Jr., appeals his jury-trial convictions for first-degree murder, use

of a firearm in the commission of a felony, discharging a firearm in public, and solicitation to alter

or destroy evidence in violation of Code §§ 18.2-29, -32, -53.1, -280, and -462. First, he argues the

trial court erred when it ruled that the Commonwealth proved he was the person who shot the

victim. Second, he contends the trial court abused its discretion by not granting him a new trial

based on a purported recantation by one of the Commonwealth's witnesses. We hold that the trial

court did not err and affirm the convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

Late one night in May 2021, Jerome Jackson and Ravon Mays were drinking in a room at the hotel where Mays lived and worked.[2] The room opened onto a second-floor walkway with stairs leading to the parking lot. When Jackson took out the trash for Mays around 1:00 a.m., a man whom he did not recognize approached from the parking lot and asked if Mays was in her room. Jackson testified that the man twice identified himself as "Whoad" or something "like Whoad." According to Jackson, he went into the room and told Mays that Whoad wanted to talk to her outside. Mays seemed to recognize the name and left the room while Jackson remained inside.

A few seconds later, the man Jackson identified as Whoad climbed the stairs at a leisurely pace and approached Mays with his hands in his pockets and a hood over his head. Mays did not visibly react when he approached her. He then pulled a handgun from his pocket and shot Mays in the head before walking calmly back down the stairs. Mays immediately fell backward and did not move. She died from a single gunshot to the forehead.

Jackson heard the gunshot and called 911 from the room. The police arrived and recovered a 9mm Luger cartridge case near Mays's body. The medical examiner removed an item "consistent in design with a . . . 9mm Luger bullet" from Mays's skull.

Detectives with the Petersburg Police Department investigated the crime. Detective Erika Rosario testified that, at the scene, Jackson told her the shooter said his name was "Whoadie" or

---

[1] On appeal, the facts are viewed "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires the Court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn" from that evidence. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] Jackson, called as a witness at Coleman's trial, testified that he "want[ed] nothing to do with th[e] case" and tried to "plea[d] the Fifth." He had pending criminal charges at the time but testified that no one had promised him anything in exchange for his testimony.

"Whoady" but that he "couldn't really hear the name correctly."  After interviewing witnesses and reviewing video footage, Rosario developed Coleman as a suspect.

The day after the murder, Detective Thomas Jefferson joined the investigation.  Rosario told him that Coleman was a suspect.  Six days after the murder, Jefferson located Coleman and took him into custody on some unrelated arrest warrants obtained by Brandee Timmons, a woman with whom Coleman had a prior relationship.  At some point during the investigation, Timmons told Detective Jefferson that she knew Coleman as "Whoadie."

Coleman waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and was questioned by Jefferson and Rosario about Mays's murder.[3]  Coleman admitted that he was at the hotel on the night Mays was shot, but he claimed he visited a friend named "Little 'El" and departed by midnight.   He said he left to go to the home of his girlfriend Tanya Browder, who lived within a few blocks of the hotel.  Coleman suggested that he and Mays "were cool."  But when asked why someone would kill Mays, he mentioned that she had filed charges against his cousin "Nelle" because Nelle slapped Mays during a disagreement.  Coleman admitted that he had several nicknames, including Whoadie, which he used on his Facebook page.

Detective Jefferson interviewed Tanya Browder, Coleman's girlfriend, at her home the next day.  Browder provided her telephone number, and Jefferson spoke with her using that number between five and ten times.  He obtained records of all phone calls to Browder from Riverside Regional Jail, where Coleman was incarcerated.  The Commonwealth played five of those calls at trial.  Although some calls came from accounts associated with other inmates, Detective Jefferson and Timmons each identified the male voice on the calls as Coleman.  A jail employee testified that inmates regularly made calls using other inmates' accounts.  At various times during the calls, the

---

[3] The interview was recorded, but the recording was not admitted into evidence.

caller and Browder discussed Coleman's cousin Nelle, another relative of Coleman's nicknamed "Pooh," and Timmons's daughter.

The first call originated from Coleman's inmate account on May 31, 2021, at 4:49 p.m. and lasted just over five minutes. During that call, after learning that Browder was willing to "walk around the street real quick" and had her purse with her, Coleman told her to "hold on" so that he could "hang up and call [her] from . . . call [her] right back." At 4:54 p.m., less than a minute after the first call ended, Browder received a second call from a different inmate account. The male caller did not provide a name but referred to Browder as "boo." After confirming that Browder was outside, the man on the phone directed her to a green trashcan in front of a big white house on a corner near her own home. He told her to "find that junk" behind the trashcan and "hide" it "somewhere real safe . . . where nobody know[s] where it's at." He instructed her to make sure she "wipe[d] that bitch" and asked her to go to "the gutter . . . on Washington and just drop that bitch in there." He also told her to "take the clip out . . . and throw the clip somewhere else."

As part of the investigation, based on information from the jail telephone calls, the police removed a manhole cover on Washington Street within a few blocks of Browder's house and the hotel. A popcorn box was visible from the surface. An officer entered the sewer and recovered the box, which was partially inside a black plastic bag. A 9mm handgun was inside the box. Lauren Claytor, an expert in "firearms and tool mark examination and identification," examined "cartridge cases" that had been test-fired from that 9mm handgun and determined that the cartridge case found near Mays's body also had been fired from that particular handgun. Jenny Mouer, an expert in latent fingerprint analysis, matched a fingerprint lifted from the plastic bag to Tanya Browder.

In February 2022, a jury convicted Coleman of first-degree murder, use of a firearm in the commission of murder, shooting in public, and solicitation to alter or destroy evidence of a felony.

Before sentencing, Coleman made a motion to set aside the verdict, arguing that the evidence was insufficient to support his convictions. The trial court denied that motion.

Also before sentencing, Coleman's counsel made a motion for a new trial based on after-discovered evidence. He claimed that "[c]ounsel ha[d] been provided an affidavit of unknown origin or validity purporting to be from" Jackson, the witness who testified that the shooter had identified himself as Whoad. Defense counsel told the court that he was "unable to say" if the affidavit was "genuine" and "d[id] not vouch for" it, but he asked the trial court to "decide what weight to give it." The affidavit stated, "I plead[ed] the Fifth Amendment [at Coleman's trial,] and the Commonwealth still forced me to answer the questions [even though] i previously told her i didn't want anything to do with the case." The affiant further wrote, "When the detectives questioned me i lied and told them anything they wanted to hear. I never heard the shooter say Woadie. The Commonwealth attorney was pressuring me to say the name was Woadie and i told her his name was Woad." Finally, the affiant insisted that he "was intoxicated that night," "really c[ould]n't recall the name that was actually said," and "d[id]n't want to be the cause of someone who might be innocent getting a life sentence by giving false statements." The affidavit was dated September 15, 2022, purportedly signed under oath by "Jeome" or "Jerome" Jackson, and signed and stamped by someone purporting to be a notary public.

Coleman also submitted an excerpt of testimony that Jackson gave during a separate trial in October 2022 that involved a charge against Coleman for possessing a firearm as a convicted felon. Jackson testified at that trial that he "was drunk and high out of [his] mind" on the night Mays was killed.[4] He claimed he did not remember telling the police that he had talked to someone named

---

[4] At Coleman's trial for the instant offenses, by contrast, Jackson testified that he was "not . . . drunk" that night, characterizing himself instead as having been "all right" and "nice." Detective Rosario similarly did not believe Jackson was intoxicated when she spoke with him on the night of the murder.

"Woadee (phonetic)" and could not remember details from that night, such as what floor Mays's room was on or whether he took out the trash. He also testified that he "gave [the police] a false statement" that night "because they kept pressing" him.

At Coleman's sentencing hearing for the instant four offenses, his counsel told the court that he "did not know where [Jackson's affidavit] came from [or] how it was put together." He had simply forwarded it to the Commonwealth and requested a subpoena for Jackson, who did not appear at the hearing. Coleman did not ask for a continuance despite Jackson's absence. Instead, he asked the court to grant him a new trial based solely on the affidavit and the transcript excerpt of Jackson's October 2022 testimony.

The trial court denied the motion. It found that it could not "put any weight on th[e] affidavit," reasoning that because Jackson did not recant on the stand, the Commonwealth could not cross-examine him and the court was unable to assess his appearance and demeanor. The court further found that "[t]here [wa]s a lot of evidence that tied" Coleman to the murder "even [after] remov[ing Jackson's] testimony." In the trial court's view, "the one small area of discrepancy where [Jackson] said that he lied regarding the victim" was "not . . . enough to then discard all of the other evidence that was presented that showed [Coleman's] guilt beyond a reasonable doubt." Coleman was sentenced to life in prison plus eight years and twelve months.

ANALYSIS

Coleman challenges his convictions on two grounds. First, he contends that the evidence was insufficient to support the convictions. Second, he argues that the trial court abused its discretion by not granting him a new trial based on the purported recantation by a Commonwealth's witness.

## I. Sufficiency of the Evidence

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question . . . is whether 'any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019) (emphasis omitted)). "If there is evidentiary support for the conviction[s], 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022) (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)).

Coleman's sole sufficiency challenge on appeal is that the Commonwealth failed to prove that he was the shooter. "At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). This Court considers "the totality of the circumstances" in reviewing whether the Commonwealth met its burden. *Id.* (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002)). Coleman's arguments challenging the proof that he was the shooter fall into two categories: (1) the jury should not have credited the Commonwealth's evidence; and (2) the evidence was circumstantial. Both categories of arguments are unavailing.

First, Coleman's arguments that "contest[] the accuracy" of the Commonwealth's evidence fail to acknowledge the standard of review, which requires the appellate court to view the evidence, and the inferences to be drawn from the evidence, in the light most favorable to the Commonwealth. *See Fary v. Commonwealth*, 77 Va. App. 331, 341-44 (2023) (en banc)

(recognizing that the "highest degree of appellate deference" is owed to the factual findings made at the trial level, including the reasonableness of inferences drawn from the circumstantial evidence (quoting *Commonwealth v. Barney*, 302 Va. 84, 96 (2023))), *aff'd*, 303 Va. 1, 1 (2024) (affirming "for the reasons stated by the en banc majority" (emphasis omitted)).  It is also well established that "determining the credibility of the witnesses and the weight afforded [their] testimony . . . are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).  This Court "may only disturb the [fact finder's] credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)).  Testimony is inherently incredible if it is either "so manifestly false that reasonable [people] ought not to believe it" or if it is "shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ." *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Coleman does not argue that any of the Commonwealth's witnesses were inherently incredible.  And he provides no other justifiable legal basis for discarding the three different types of evidence he characterizes as unworthy of belief as a matter of law.  Coleman first challenges the expert forensic conclusions of Claytor and Mouer.  He contends those conclusions must be discarded as tenuous on the ground that the witnesses did not provide adequate information to permit evaluation of the accuracy of their conclusions.[5]  Next, he suggests that

---

[5] Notably, Coleman did not object to the Commonwealth's request to designate Claytor or Mouer as an expert witness, nor did he seek to exclude either of their opinions as unreliable. He therefore conceded that their testimony was "*beyond the knowledge and experience of ordinary persons*, such that the jury need[ed] expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." *See* Va. R. Evid. 2:702(a)(ii)

Detective Jefferson's testimony about his statements during questioning by police was not worthy of belief because the Commonwealth did not submit a recording of the interview. Last, he argues that this Court is required to discard the testimony of Detective Jefferson and Timmons identifying the voice on the jail calls as his. He contends that Jefferson did not know him very well and Timmons had a motive to lie. Coleman made each of these arguments to the jury in closing. The jury, acting as the finder of the facts, was free to conclude, after considering Coleman's arguments, that the Commonwealth's witnesses were credible, knowledgeable, and believable. *See Raspberry*, 71 Va. App. at 29. The record provides no legal basis for disturbing that decision.

We turn next to Coleman's second category of arguments, which challenge the circumstantial evidence of his guilt. "Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony." *Maust v. Commonwealth*, 77 Va. App. 687, 699 (2023) (en banc) (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). A conviction may be sustained on circumstantial evidence alone provided it "is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Kelley*, 69 Va. App. at 629 (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). And contrary to Coleman's approach on appeal, circumstantial evidence is not viewed in isolation. *Barney*, 302

---

(emphasis added); *see also Logan v. Commonwealth*, 47 Va. App. 168, 172 & n.4 (2005) (en banc) (recognizing a party can concede facts and a court can accept concessions of law that qualify as waivers), *cited with approval in Commonwealth v. Holman*, 303 Va. 62, 75 (2024). Of course, Coleman could and did attack their methods and conclusions on cross-examination. *Cf. McDaniel v. Commonwealth*, 73 Va. App. 299, 312-13 (2021) (explaining that a challenge to the conclusions of a blood-spatter expert because she merely viewed photos of the crime scene went to the weight of her testimony rather than its admissibility). But we are unpersuaded by his arguments that their expert opinions could not be trusted because they did not provide the laypersons on the jury with the raw data they used to form those opinions. *Cf. id.* The jury was entitled to credit the experts' comparisons of the cartridge cases and fingerprints they found were matching. *Cf.* Va. R. Evid. 2:703(b) (providing that in criminal cases, "the opinion of an expert is generally admissible if" based on "facts in evidence" *or* "facts personally known or observed by the expert").

- 9 -

Va. at 97.  Instead, "'while no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable [fact finder] irresistibly to . . . conclu[de]' . . . beyond a reasonable doubt" that the defendant is guilty.  *Id.* at 98 (first alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)); *accord Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019).

Here, the circumstantial evidence was sufficient to identify Coleman as the shooter. Jackson told the police at the scene that the shooter's name was "Whoadie" or "Whoady."  He also testified at trial, albeit reluctantly, that the shooter identified himself as "Whoad" or "some[thing]" "like Whoad."[6]  Timmons testified that she knew Coleman as "Whoadie," and Coleman admitted to the police that "Whoadie" was one of his nicknames, which he used on Facebook.

Coleman also admitted to the police that he was at the hotel where Mays lived on the night of her murder.  Although he claimed that he left the hotel by midnight, about an hour before Mays's murder, the jury "was at liberty to discount [his] self-serving statements as little more than lying to conceal his guilt" and to conclude that he was still there at the time of the shooting.  *See Poole v. Commonwealth*, 73 Va. App. 357, 369 (2021) (quoting *Becker v. Commonwealth*, 64 Va. App. 481, 495 (2015)); *accord Burns v. Commonwealth*, 261 Va. 307, 316-17, 337 (2001) (applying this doctrine to statements made during police questioning). Moreover, the jury could compare the video of the shooter to their observations of Coleman at trial, as well as to the information in the record about his height and weight at the time of his arrest.  *Cf. Barney*, 302 Va. at 97 (recognizing that the findings to which the appellate court must

_____

[6] Contrary to Coleman's suggestion on appeal, the trial testimony of both Jackson and Detective Rosario also established that Jackson was not drunk at the time of the murder.

defer include "the factfinder's 'interpretation of . . . video evidence' presented at trial" (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022))).

Finally, the contents of the recordings of the telephone calls made from the jail to Browder, Coleman's girlfriend, provided strong incriminating evidence. Timmons, a former girlfriend, and Detective Jefferson both identified the male caller as Coleman, and the caller repeatedly referenced other people in Coleman's life, corroborating those voice identifications. *See Opanowich v. Commonwealth*, 196 Va. 342, 352 (1954) (approving the identification of a person's voice in a telephone call by someone familiar with it); *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011) (upholding the appellant's conviction for robbery in part based on a witness's identification of him by voice). Further, mere moments before the most incriminating call, Coleman told Browder during a call made from his own inmate account to "hold on" so that he could "call [her] *from* . . . call [her] right back"—seemingly indicating that he was going to call her from another inmate's account. (Emphasis added). The jury could reasonably conclude from this evidence that Coleman was the caller in each recording and told Browder both where to retrieve and where to discard what turned out to be the murder weapon. This evidence was significant and incriminating because police recovered that firearm in a plastic bag with Browder's fingerprint on it from a nearby storm drain, exactly where Coleman told her to hide it, and then matched that firearm to the casing found next to Mays's body.[7]

---

[7] Coleman's asserted hypotheses of innocence ignore contradictory evidence in the record and rely on unreasonable inferences. His hypothesis that he wanted to distance himself from the firearm merely because he was a convicted felon fails to account for the forensic evidence specifically tying the gun to Mays's murder. His hypothesis that he was protecting the real shooter is pure speculation and ignores the evidence tying him to the scene. Finally, his hypothesis that someone else put the firearm in the black bag after Browder discarded the bag strains credulity, especially when one considers the jail calls. "[T]he Commonwealth is 'not required to exclude every possibility' of the defendant's innocence but, rather, 'only . . . hypotheses of innocence that flow from the evidence.'" *Rams*, 70 Va. App. at 28 (second alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). Whether an alternate hypothesis of innocence is reasonable is a question of fact that "is binding on appeal

This evidence, viewed under the proper standard, was sufficient to prove that Coleman was the shooter, the only element challenged on appeal. As a result, we hold that the evidence was sufficient to support the convictions.

## II. Motion for a New Trial

Coleman argues that the trial court abused its discretion by not granting him a new trial based on a purported recantation by Jerome Jackson, one of the Commonwealth's witnesses.

A motion for a new trial based on after-discovered evidence "is a matter submitted to the sound discretion of the [trial] court." *Bagley v. Commonwealth*, 73 Va. App. 1, 22 (2021) (quoting *Orndorff v. Commonwealth*, 279 Va. 597, 601 (2010)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Barney*, 302 Va. at 94 (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" in the conclusion that the lower court erred. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[T]he phrase 'abuse of discretion' means that the [trial] court 'has a range of choice[] and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Ellis v. Commonwealth*, 68 Va. App. 706, 711 (2018) (first alteration in original) (quoting *Sauder*, 289 Va. at 459).

The substantive law in this area is well defined. Granting a motion for a new trial is an extreme remedy. *See Johnson v. Commonwealth*, 41 Va. App. 37, 43 (2003) ("Motions for new trials based upon after-discovered evidence . . . are awarded with great reluctance." (quoting

---

unless plainly wrong." *Id.* (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010)). On this record, the jury's rejection of the hypotheses of innocence was not plainly wrong.

- 12 -

*Odum v. Commonwealth*, 225 Va. 123, 130 (1983))).  Such a motion "will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented."  *Bondi v. Commonwealth*, 70 Va. App. 79, 92 (2019) (quoting *Orndorff*, 279 Va. at 601).  To be entitled to a new trial, a criminal defendant must prove the evidence (1) "was discovered after trial;" (2) "could not have been obtained prior to trial through the exercise of reasonable diligence;" (3) "is not merely cumulative, corroborative[,] or collateral;" and (4) "is material" and therefore "should produce an opposite result on the merits at another trial."  *Johnson*, 41 Va. App. at 43 (quoting *Mundy v. Commonwealth*, 11 Va. App. 461, 480, *aff'd on reh'g en banc*, 399 S.E.2d 29 (1990)).  To justify this extreme action, "[t]he burden is on the moving party to show that all four of these requirements have been met."  *Id.*

Here, the trial court did not abuse its discretion in determining that Coleman's alleged after-discovered evidence was not material.[8]  "Before setting aside a verdict, the trial court must have evidence before it to show in a clear and convincing manner 'as to leave no room for doubt' that the after-discovered evidence, if true[,] would produce a different result at another trial."  *Id.* at 44 (quoting *Carter v. Commonwealth*, 10 Va. App. 507, 513 (1990)).  As a preliminary matter, in assessing materiality, the trial court should determine whether the newly discovered evidence is credible.  *See Odum*, 225 Va. at 131 ("[W]hile the evidence, *if believed*, was material, the trial court, assessing the credibility of [the] defendant's witnesses both at trial and at the motion hearing, properly could find that it was not such as should produce opposite results on the merits at another trial." (emphasis added)); *accord Orndorff*, 279 Va. at 603; *Hopkins v. Commonwealth*, 20 Va. App. 242, 250, 252 (1995) (en banc).  The alleged after-discovered

---

[8] Coleman bore the burden of proving all four prongs.  Accordingly, we need not address the first three prongs because we hold he did not prove the fourth one.  *See Bondi*, 70 Va. App. at 93 (applying best-and-narrowest-ground principles to affirm due to the appellant's failure to prove the materiality prong of the test for a new trial based on after-discovered evidence).

evidence in this case is a recantation. The Supreme Court of Virginia has observed in the actual innocence context that "recantation evidence is generally questionable in character and is widely viewed by courts with suspicion because of the obvious opportunities and temptations for fraud." *Carpitcher v. Commonwealth*, 273 Va. 335, 346 (2007) (collecting cases), *quoted with approval in Haas v. Commonwealth*, 283 Va. 284, 292 (2012). "Unless proven true, recantation evidence merely amounts to an attack on a witness'[s] credibility by the witness h[im]self." *Id.*; *see Madison v. Commonwealth*, 71 Va. App. 678, 696-97 (2020).

The alleged recantation evidence in this case does not meet the materiality standard for three reasons. First, proof of its authenticity is lacking. Second, if believed, the degree of contradiction it provides is slight at best. And third, due to that slight contradiction, the evidence as a whole fails to establish the recantation was material. We address each of these reasons in turn.

First, significantly, the alleged recantation evidence in this case is particularly questionable at the outset. Defense counsel was not able to vouch for the affidavit's authenticity in the trial court or provide information about its origin. In fact, counsel explained that he was unable to say if it was "genuine." Additionally, the alleged affiant, Jackson, was subpoenaed but was not present to testify at the motion hearing, and Coleman did not ask for a continuance. As a result, the contents of the affidavit were suspect and not subject to cross-examination. The trial court specifically found that it could not give the affidavit "any weight" because Jackson did not testify and it consequently could not assess his credibility and demeanor.

Second, the alleged recantation evidence as a whole—in the form of the unauthenticated affidavit and Jackson's testimony at the trial on the separate firearm charge—was not in direct conflict with Jackson's testimony at trial. With regard to the affidavit, Coleman characterizes it as "confess[ing]" that Jackson "l[ied] to the police" and "never heard the shooter say the name

'Whoad.'"  An alternative interpretation of the affidavit, however, is that Jackson reported the person's name was the one-syllable "Woad" and the prosecutor "pressur[ed him] to say the name was" two syllables, "Woadie."  Given the similarity in these two names and the absence of clarifying testimony from Jackson, the affidavit contributes very little to Coleman's burden of establishing, under the fourth prong of the test, that Jackson's alleged new statement was material.[9]  Further, the affidavit's claim that the Commonwealth's Attorney pressured the affiant to say the name "Woadie" is undermined by Detective Rosario's testimony that Jackson gave her the name "Whoadie or Whoady" on the night of the murder, presumably before he ever spoke to the prosecutor.

With regard to Jackson's October 2022 "recantation" testimony in a different trial, the record also does not compel the conclusion that Coleman presented clear and convincing evidence that a jury would believe that testimony over his testimony in this case, namely that the shooter identified himself to Jackson as "Whoad."  Jackson's so-called recantation testimony at the other trial was less than clear.  After confirming he was with Mays that night, he testified that he gave the police a "false statement" about the murder but also said he "just d[id]n't remember what happened."  When Jackson was asked specifically whether he "told the detective that the [shooter] said his name was Wo (phonetic) or Woadee (phonetic)," he replied simply, "I don't remember that . . . ."  As a result, neither the unauthenticated affidavit nor the alleged recantation testimony directly contradicted Jackson's testimony at trial.

---

[9] In fact, under the interpretation of the affidavit as stating that the shooter identified himself to Jackson as "Woad," the affidavit is "merely cumulative" of Jackson's trial testimony that the shooter said his name was "Whoad," which fails to meet the test's third prong.  *See Johnson*, 41 Va. App. at 43 (noting that the third prong of the new-trial test requires proof that the after-discovered evidence "is not merely cumulative, corroborative[,] or collateral"); *see also Bondi*, 70 Va. App. at 93 (explaining that the failure to prove any single prong of the four-part test defeats a request for a new trial based on after-discovered evidence).

Third, the record entirely supports the trial court's conclusion that even if Jackson had lied, the remaining evidence proved Coleman's guilt of first-degree murder and the related crimes beyond a reasonable doubt and that the jury would have convicted him of those offenses anyway, thereby rebutting any claim of materiality. That evidence included a motive in that Coleman admitted Mays had filed charges against his cousin for allegedly slapping Mays during a disagreement. It also included opportunity to commit the offense because Coleman conceded he was at the hotel shortly before the murder occurred and surveillance video showed that the murderer matched Coleman's tall, thin stature, something the jury could assess. Further, the evidence linked him to the means to accomplish the murder. A cartridge case was found next to the victim's body, and the gun from which the cartridge case was fired was discovered in a sewer, precisely where Coleman told Browder to dispose of the gun. That gun and matching cartridge case were consistent with the bullet extracted from Mays's head. Browder's fingerprint was on the bag that contained the gun, confirming that she followed Coleman's instructions to retrieve the weapon from his hiding place and discard it where he instructed. As a result, the alleged after-discovered evidence does not meet the materiality standard of "leav[ing] no room for doubt" that the result of the trial would have been different if the jury had considered it. *See Johnson*, 41 Va. App. at 44.

Accordingly, the trial court did not abuse its discretion by denying Coleman's motion for a new trial.

CONCLUSION

For these reasons, we hold the evidence was sufficient to prove that Coleman committed the charged offenses. Further, the trial court did not err by concluding that Coleman failed to establish

- 16 -

his entitlement to a new trial.  Accordingly, we affirm the convictions and remand for the sole

purpose of correcting a clerical error in the sentencing order.[10]

*Affirmed and remanded.*

---

[10] The applicable indictment, jury verdict form, and trial order reflect that Coleman was charged with and found guilty of the inchoate offense of *solicitation* to alter or destroy evidence of a felony in violation of Code §§ 18.2-29 and -462, which is either a Class 5 or Class 6 felony depending upon the age of the person solicited.  The sentencing order, however, lists a conviction for the *substantive* offense of altering or destroying evidence of a felony and references only Code § 18.2-462, a Class 6 felony, as the offense of conviction.  We remand to the trial court to address the omission from the sentencing order of any reference to the crime of solicitation in violation of Code § 18.2-29.  *See* Code § 8.01-428(B); *Bagley*, 73 Va. App. at 30 n.10.