Present:   All the Justices

DOUGLAS E. DOWDEN

                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 992562              November 3, 2000

COMMONWEALTH OF VIRGINIA

              FROM THE COURT OF APPEALS OF VIRGINIA

     Douglas E. Dowden was tried before a jury in the Circuit

Court of Loudoun County and convicted of the involuntary

manslaughter of his son, Dyvon Dowden.  He was sentenced in

accordance with the jury's verdict to serve 10 years'

imprisonment, and the circuit court suspended execution of

seven years of that sentence.  The Court of Appeals affirmed

the circuit court's judgment and, here, Dowden challenges the

sufficiency of the evidence to sustain his conviction.

                              I.

     Applying well-established principles of appellate review,

we will consider the evidence and all reasonable inferences

fairly deducible therefrom in the light most favorable to the

Commonwealth, the prevailing party below.  Phan v.

Commonwealth, 258 Va. 506, 508, 521 S.E.2d 282, 282 (1999);

Derr v. Commonwealth, 242 Va. 413, 424, 410 S.E.2d 662, 668

(1991).

     The defendant and Tammy Lato were the unmarried parents

of Dyvon Dowden, a seven-month-old male baby who weighed about

17 pounds.  The baby and his parents lived in a house in

Loudoun County with several other occupants, including James Reeder and his wife, Kim Reeder.

On July 6, 1997, Lato "put Dyvon to bed" at approximately 8:00 p.m. in a portable playpen located in a room that she shared with the defendant. Lato testified that Dyvon was a "[p]erfectly healthy" baby who could crawl, "stand up on things," walk on the couch, and hold his own bottle. Dyvon was "perfectly normal." Lato described Dyvon's general physical condition when she put him in the playpen as "[p]erfectly fine." When she placed him in the playpen at 8:00 p.m., she gave him a bottle of Pedialyte, which is a purple-colored liquid that her pediatrician had recommended she give to the baby. The playpen where she placed Dyvon was "an inch to two inches" away from a bed where the defendant was sleeping.

Lato went to sleep in the bed with the defendant about 1:30 a.m. on July 7, 1997. She awoke at approximately 3:00 or 3:30 a.m. When she got out of the bed, she could hear Dyvon moving in the playpen and making noise. As she left the bedroom to go to a kitchen and prepare a bottle of baby formula for Dyvon, there was nothing about his health that gave her any concerns.

After Lato had prepared the baby's bottle, she returned to the bedroom and tried to give the bottle to Dyvon, but he

2

refused to take it.  Dyvon, who was lying on his back, used both hands to "push [the bottle] away three times."  Lato testified that after she tried to give Dyvon the bottle, "he started to make a gasping sound. . . . [j]ust like the air had been knocked out of him."

Lato "pulled Dyvon" out of the crib and immediately noticed that "[h]is arms were limp" and his skin "was cool."  She placed the baby on the edge of her bed, and she "checked him over."  The baby continued to "gasp" for air.  She checked him because she was afraid that he may have been "bitten by a spider."  The defendant, who Lato purportedly had awakened, also "checked" the baby and "looked in [the baby's] mouth."

Lato told the defendant that she was going to take Dyvon to a hospital.  She left the bedroom and went to a living room to get the baby's car seat.  The defendant picked up the car seat and placed the car seat and the baby in the car.  Lato drove away in her car.  The defendant did not accompany her, and he returned to the house, but he did not inform any of the other occupants of the house of the baby's condition.

After Lato drove her car away from the house, she realized that she did not know the location of a hospital.  She drove her car into the parking lot of a convenience store, got out of her car, entered the store, and asked an attendant

3

for the location of a hospital.  The attendant told her to "go across the street to the rescue center."

Lato returned to her car and drove across the street to the Sterling Volunteer Fire Department.  She knocked on the door, and Stacy Dawson, a volunteer with the Sterling Volunteer Fire Department, responded.  Dawson, who had been trained and certified to perform cardiopulmonary resuscitation (CPR), but had let her certification lapse because she had been out of the United States, placed the baby on the floor and began to perform CPR.

Dawson testified that the baby "was absolutely just the whitest" baby she had ever seen, and the baby "looked like a doll."  The baby "was very, very pale, almost yellowish but [had] no color in it.  And the [baby's] eyes were closed . . . ."  Dawson also noticed that the baby "was very cold." Dawson lifted the baby out of the car seat, and he was "totally limp, just like a doll."  She saw no movement in the baby, and he made no sounds.  The baby did not have a discernable heartbeat, chest movement, or pulse.

While the emergency response personnel were trying to resuscitate the baby, Lato made a telephone call to the house where she lived and spoke with Kim Reeder, the defendant's sister-in-law.  Kim Reeder informed the defendant's half-brother, James Reeder, that Lato had taken the baby to a fire

4

station.  James Reeder directed his wife to inform the defendant so that they could go to the station and be with Lato and the baby.

Richard Laughlin, a cardiac technician with the Sterling Rescue Squad, also described the condition of the baby that morning.  He stated that the baby was "very white or ashen, or what I term 'china doll' appearance . . . [t]here was no eye movement, and it was a very limp infant, no movement at all." Laughlin examined the baby and concluded "that the [baby] was dead and [that Laughlin] needed to start trying to revive him."

Laughlin tried to intubate the baby, but the baby's airway was blocked.  The baby was given a mask which was used to push oxygen through the mouth into the baby's lungs.  Mike DePine, another emergency technician, administered "five blows" to Dyvon's back in an effort to clear his airway.  When DePine administered "the blows," fluid emitted from the baby's mouth.  A second set of five "blows" was administered to the baby's back, and additional fluid was emitted.  Dyvon was taken to a hospital, and further efforts were made to resuscitate him.  Eventually, Dyvon was declared dead.

James Reeder testified that when he returned from the hospital, he "was searching for a reason why a perfectly healthy baby could go to sleep at night and wake up and all of

5

a sudden be dead."  Two days after the baby's death, he spoke with the defendant about what might have happened.  Reeder testified as follows:

> "Q:  On the second day after Dyvon's death, did you have occasion to ask or do you recall whether or not you asked [the defendant] what happened?
>
> "A:  Yes, I did.
>
> "Q:  What answer did you get?
>
> "A:  I got — he says he wasn't sure, he didn't know, that he might have, you know, he says — he wanted to know if he kicked the crib or something that — what would that be.  And I said, well, you know, that would be some form of manslaughter because we come back from his lawyer's office when we discussed about that.  And he said — I said it would be some type of manslaughter.  And then he says, well, no matter what it is, I'm not going to let Tamm[y] take the fall, and that was all he said.
>
> "Q:  Did he ever explain what he meant by that by not going to let Tamm[y] take the fall?
>
> "A:  No.  I asked him.  He's a very quiet individual and he wouldn't say.
>
> "Q:  Did there come a point in time when he indicated to you that if he kicked the [baby], he didn't know it?
>
> "A:  No, I don't think he did.  I think he might have stated that he could have kicked it, but I don't think he said he did kick it.  He said he was just — I don't know what he was asking and why he was making a statement like that when he said it.  It just baffled me.
>
> "Q:  The statement that baffled you was?
>
> "A:  Why he would ask, you know, if [he] kicked the baby —

6

"Q: What is the charge?

"A: Yes, what would that be. And, you know, I don't understand that, and then I really didn't understand why he said he would cover for her.

. . . .

"Q: My question is did there come a point in time on the second or third day when you had a conversation with [the defendant] that he used the word 'hypothetical'?

"A: Yes.

"Q: Would you please, as best you recall, what did he say?

"A: He said, hypothetically, if I kicked the crib, what would that be, and that was his statement.

"Q: James, you indicated, I believe, in your testimony that you were mad or upset with [the defendant]?

"A: I was upset with both of them, very. I mean —

. . . .

"Q: Did you ever accuse [the defendant] of doing anything to the [baby]?

"A: Being involved with what happened in there, yes.

"Q: What if any response did you get?

"A: None."

The Reverend Charles E. Grant, an emergency medical technician chaplain, had a conversation with the defendant at the hospital on the morning of July 7, 1997. Grant and the

7

defendant were in a room while the hospital's emergency room personnel were trying to revive the baby. During the conversation, the defendant told Grant that the defendant was holding Dyvon and that the baby was alive when Lato prepared the baby's bottle of formula earlier that morning. Grant testified that the defendant's statement was unusual "because everything the mother had said up to then led us to believe that she was the only one awake when she ran out of the house with the baby, and I thought that was unusual." During defense counsel's cross-examination of Grant, the following exchange occurred:

"Q: Now, the statement that [the defendant] made to you, do you recall the exact words that he said, not the impression that you had, not the time frame you thought, the words that came out of his mouth?

"A: I'm positive that he said something to the effect that he held the baby while [the mother] was getting the bottle, and that I know for sure because it stood out in my mind . . . ."

Dr. Frances Patricia Field, assistant chief medical examiner for the Northern Virginia District of the Medical Examiner's Office, performed an autopsy on Dyvon's body. She qualified at trial as an expert witness on the subject of forensic pathology. She stated that the baby's brain was swollen and that "[t]here was a one-quarter inch flap, long laceration or tearing of the spleen on the upper half of the

8

inner surface of the spleen. That tear went into the tissue of the spleen to about one-eighth inch deep." The rupture of the spleen was sufficient to cause the baby's death.

Dr. Field also testified that the baby suffered three bruises to his thymus, bruises to the heart and lungs, and an injury to the front wall of the urinary bladder. Dr. Field stated that upon her examination of the baby's liver, "[t]here was a one-half inch full thickness laceration or tearing of the tissue of the liver. Full thickness means all the way through from front to back. The left lobe of the liver — it also tore in that same region a branch of the portal vein."

Dr. Field testified that all the baby's injuries were caused by blunt force trauma, and the injuries occurred "at essentially the same time." Dr. Field opined that the baby's injuries could not have been caused by CPR.

Dr. Robin Foster, a professor of pediatrics at the Medical College of Virginia and director of the Pediatric Emergency Services and director of the Child Protective Team at the Medical College of Virginia, qualified as an expert witness in pediatric emergency care and pediatrics. She testified that the cause of the baby's death was consistent with severe blunt force trauma and that the baby's death was not related to the CPR. She gave the following testimony:

9

"Q: Is there anything in the documents or photographs that you reviewed that would lead you to believe that these injuries could have been caused by CPR?

"A: No, sir.

"Q: No, sir, what?

"A: No, sir, the pattern of injury is not consistent with the injuries being caused by CPR."

Dr. Jack Daniel, who qualified as an expert witness on the subject of forensic pathology, testified that he had never seen a lacerated liver caused by CPR. He stated, without objection,

"I have seen a CPR related injury using a thumper, which is what that external device is, that was as bad as that in an adult, an elderly person, but I have never seen — number one, I've never seen a laceration in a liver that was due to CPR. Number two, I have never heard of it, and I haven't found looking at the literature, and I have searched extensively in trying to find such lacerations, and I have also spoken to the author of an article specifically on this subject, that is CPR related injuries in children, and neither he nor his colleagues have heard of such an injury occurring in a child. And all of that put together makes me very, very confident in saying that I just can't attribute this injury to CPR."

Dr. Daniel also testified that the bruise to the baby's urinary bladder could not have been caused by the administration of CPR.

The defendant denied that he killed his son. He also testified that he did not strike his son. The defendant claimed that he was asleep when Lato prepared the bottle of

10

baby formula for the baby, and that the Reverend Grant was incorrect when he testified that the defendant said that he was holding the baby when Lato prepared the baby's formula. The defendant also adduced expert testimony that the baby's injuries were caused by the administration of CPR.

## II.

## A.

The defendant asserts that the evidence is insufficient to support his conviction for involuntary manslaughter. The defendant argues that the Commonwealth failed to exclude every reasonable hypothesis of innocence and that his conviction is based upon a suspicion or probability of guilt. We disagree with the defendant's contentions.

We will apply the following principles of appellate review to our resolution of this appeal:

> "Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it . . . [Code § 8.01-680]."

Black v. Commonwealth, 222 Va. 838, 841, 284 S.E.2d 608, 610 (1981) (quoting Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)); accord Phan, 258 Va. at 511, 521 S.E.2d at 284. Additionally, when a defendant challenges

the sufficiency of the evidence, " '[i]f there is evidence to sustain the verdict, this Court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury.' " George v. Commonwealth, 242 Va. 264, 278, 411 S.E.2d 12, 20 (1991) (quoting Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961)), cert. denied, 503 U.S. 973 (1992).

We have also stated that:

> "When the evidence is wholly circumstantial . . . all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.  The chain of necessary circumstances must be unbroken.  Nevertheless, it is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts."

Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976).  And, circumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt. Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983), cert. denied, 465 U.S. 1109 (1984).  The Commonwealth, however, is not required to exclude every possibility that others may have committed the crime for which a defendant is charged, but is only required to exclude hypotheses of innocence that flow from the evidence.  Goins v. Commonwealth,

12

251 Va. 442, 467, 470 S.E.2d 114, 130, cert. denied, 519 U.S. 887 (1996); Spencer v. Commonwealth, 238 Va. 275, 283-84, 384 S.E.2d 775, 779 (1989), cert. denied, 493 U.S. 1036 (1990); Fordham v. Commonwealth, 13 Va. App. 235, 239, 409 S.E.2d 829, 831 (1991).

Applying the aforementioned principles, we hold that the evidence, though circumstantial, establishes the defendant's guilt beyond a reasonable doubt and excludes hypotheses of innocence that flow from the evidence. The jury could have inferred from the evidence that the defendant was awake when Lato left the bedroom to prepare the baby's bottle and that the defendant kicked or hit the baby, thereby injuring him. When the mother left the bedroom to prepare the bottle of baby formula, the baby was "fine." When the mother returned with the bottle of formula, the baby was gasping "[j]ust like the air had been knocked out of him." No one was with the baby during that interval except for the defendant, who was awake.

As we have already stated, the defendant asked his half-brother, James Reeder, what crime the defendant might be charged with if the defendant kicked the crib where the baby was located. The defendant also told Reeder that the defendant "could have kicked it." And, when Reeder accused the defendant of "doing something" to the baby, the defendant refused to respond. In our jurisprudence, the defendant's

13

failure to respond constitutes an implied admission.  We have held:

> "[W]hen a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth. The basis of such rule is that the natural reaction of one accused of the commission of a crime or of implication therein is to deny the accusation if it is unjust or unfounded."

Owens v. Commonwealth, 186 Va. 689, 698, 43 S.E.2d 895, 899 (1947); accord Tillman v. Commonwealth, 185 Va. 46, 56, 37 S.E.2d 768, 773 (1946).

The medical testimony adduced by the Commonwealth, when considered with other evidence, establishes that the defendant perpetrated the criminal acts.  Dr. Field testified that the baby's injuries were caused by blunt force trauma and that the injuries occurred essentially at the same time.  The injuries were caused before the baby's death and were not caused by the administration of the CPR.  The defendant's own expert witness, Dr. John E. Adams, a forensic pathologist, testified that the baby's injuries were "consistent with a severe beating."  Dr. Daniel testified that he had neither seen nor read about a laceration to a baby's liver caused by the administration of CPR.  As we have already noted, Dr. Daniel

14

testified that he was "very, very confident in saying that [he] just can't attribute this injury to CPR."

The only hypothesis of innocence based upon the evidence in this record is that the baby's injuries may have been caused when the emergency response personnel administered the CPR.  However, the Commonwealth presented evidence, beyond a reasonable doubt, that the baby's injuries were caused by the defendant, not by the administration of CPR.  And, the evidence of record indicates beyond a reasonable doubt that the baby exhibited symptoms of injuries before anyone administered CPR to him.

Moreover, the jury was not required to believe the defendant's explanation, and if that explanation is not believed, the jury may infer that the accused is lying to conceal his guilt.  Phan, 258 Va. at 511, 521 S.E.2d at 284; Black v. Commonwealth, 222 Va. at 842, 284 S.E.2d at 610; Toler v. Commonwealth, 188 Va. 774, 782, 51 S.E.2d 210, 214 (1949); Speight v. Commonwealth, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (en banc).

We hold that the evidence of record, when considered as a whole, is sufficient to support the jury's finding that the defendant was guilty of involuntary manslaughter.  "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each

insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.' " Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 564 (1919)), cert. denied, 445 U.S. 972 (1980); accord Derr, 242 Va. at 425, 410 S.E.2d at 669.

## B.

The defendant argues that the evidence failed to establish that he acted with gross negligence. The defendant says that the "only evidence introduced regarding the possibility that [he] kicked Dyvon came from an exchange between [the defendant] and his brother." We disagree with the defendant.

We have defined involuntary manslaughter "as the accidental killing of a person, contrary to the intention of the parties, during the prosecution of an unlawful, but not felonious, act, or during the improper performance of some lawful act." Gooden v. Commonwealth, 226 Va. 565, 571, 311 S.E.2d 780, 784 (1984); accord Beck v. Commonwealth, 216 Va. 1, 4, 216 S.E.2d 8, 9-10 (1975); Mundy v. Commonwealth, 144 Va. 609, 615, 131 S.E. 242, 244 (1926).

The jury was instructed that if it found that the Commonwealth proved beyond a reasonable doubt that the defendant killed Dyvon Dowden and "[t]hat the killing,

16

although unintended, was the direct result of negligence accompanied by carelessness so gross, wanton and culpable as to show a callous disregard of human life," then the jury could find that the defendant was guilty of involuntary manslaughter.  The extensive medical evidence, which we have already summarized, established that the baby's injuries were caused by blunt force trauma unrelated to the administration of CPR.  The evidence of record established, beyond a reasonable doubt, that the defendant killed Dyvon Dowden by either kicking him or delivering a severe blow to his body, and the jury was entitled to infer from those acts that the killing, although unintended, was the direct result of negligence accompanied by carelessness so gross, wanton, and culpable that it showed a callous disregard for the baby's life.

### III.

Finding no merit in the defendant's contentions, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.