COURT OF APPEALS OF VIRGINIA

Present:   Judges Chaney, Callins and Senior Judge Humphreys
Argued at Leesburg, Virginia

JIMI ARGEDIS SALGADO

                                                MEMORANDUM OPINION* BY

v.       Record No. 1001-23-4              JUDGE VERNIDA R. CHANEY
                                                    FEBRUARY 18, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Alfred D. Swersky, Judge Designate

Lauren Brice, Assistant Public Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

Anna M. Hughes, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, the Prince William County Circuit Court convicted Jimi Salgado of

malicious wounding, Code § 18.2-51, and misdemeanor destruction of property, Code § 18.2-137.

Salgado contends that the evidence failed to prove (1) that his actions were malicious, or (2) that he

was the person responsible for the destruction of the complaining witness's damaged vehicle. This

Court finds that the evidence was sufficient to support Salgado's convictions and, therefore, affirms

the circuit court's judgment.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."

*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Ilka McCoy and Salgado were in a romantic relationship and lived together until May 2021. By August 2021 they had broken up, lived separately, and McCoy was dating Oscar Lucas. Nevertheless, McCoy and Salgado contacted each other "every couple days" in an effort to remain friends and because McCoy was still receiving Salgado's mail. On August 16, 2021, Salgado texted McCoy while she was at work, indicating that he wanted to see her. She agreed to visit him at his house after work. McCoy arrived at Salgado's house at around 8:00 p.m. and parked her car behind Salgado's vehicle across the street. Salgado met her at the door and the two walked into his bedroom, where she placed her keys and her purse before crossing the hallway to enter the bathroom. As she was leaving the bathroom, she heard a knock on the front door, and then she heard Lucas say, "Is Jimi home?" McCoy was shocked to see Lucas at Salgado's residence because she had not told Lucas that she was there, and she had never told him where Salgado lived.

Through the front window, McCoy observed Lucas and Will Bonilla in front of the house. Bonilla, who was a friend of both Salgado and Lucas, had introduced her to both men and was watching from a Jeep that was parked in the driveway. McCoy told Salgado, who was still in his bedroom, "Look, look what your friend [Bonilla] did," and instructed Salgado to "[j]ust stay here, I'm going to leave." Instead, Salgado went to the front door "to see who was looking for him" and exchanged "a couple words" with Lucas. Shortly thereafter, the two men began fighting. When McCoy went outside, she observed Lucas on top of Salgado. McCoy "grabbed [Lucas] from the back of his shirt" and demanded that he get up and let Salgado go. Fearing that Lucas would get into trouble, she asked him to leave, saying, "Just get off of [Salgado]. It's not worth it. He's not worth it. I'm not worth it. Just get up and go, you don't need any trouble." After Lucas left, McCoy approached Bonilla, slapped him across the face, and demanded, "why would you do that?

- 2 -

Why would you bring [Lucas] here?" McCoy then helped Salgado find his eyeglasses, and the two re-entered the house and returned to his bedroom. While outside, Salgado did not strike, yell at, or argue with McCoy.

Inside the bedroom, Salgado yelled at McCoy, "Look what you did. You brought trouble to my house." He then grabbed her hair and head-butted her before pushing her down on the bed. She hit the wall with the right side of her face as Salgado pinned her down and "just [started] swinging wherever he could." Salgado slapped her and head-butted her repeatedly and then began to punch her with his closed fist. She put her left arm up to block his punches and yelled for him to stop. Her forehead was "hurting because of all the head-butts," and the blows to her face were painful. Salgado only stopped beating her when Hernan Zelaya-Otero, Salgado's landlord, entered the bedroom and yelled, "What the hell? What are you doing? Let her go." Salgado stopped hitting her and responded, "Yeah, yeah. We're leaving."

After Zelaya-Otero left the room, Salgado again complained, "See, that's what I'm -- You brought trouble to my house," and began a second round of blows with his fist to her face, her arms, and her legs. When Zelaya-Otero returned to the room a second time and threatened to call the police, Salgado said, "No, no, no, I'm just getting my shoes. We're going to leave." At that point, Zelaya-Otero separated the couple and guided McCoy to his girlfriend, who was waiting in the hallway. The two women went to the bathroom so McCoy could wipe "all the blood" from her face. At no point did McCoy physically strike back at Salgado. She only tried to block his punches with her left arm.

McCoy sat at the dining room table with an ice pack on her face, while Salgado, who by then had her car keys, said that he would take her home. He told her "see, that's what happened to you for being a slut." Salgado took her purse outside and put it in the back seat of his car. He then returned her keys and said she could leave. When McCoy reached her car, she noticed that her

purse, which contained her cell phone and her wallet, was in Salgado's car, and she therefore felt that she could not leave. Salgado suggested that she retrieve her purse and when she opened the door he instructed her to get in his car and yelled that she was leaving with him. Afraid, McCoy entered the vehicle, at first sitting in the back seat, but then upon Salgado's insistence, sitting in the front seat. On their way to McCoy's house, Salgado called Bonilla and yelled, "You brought him here. You set me up. . . . I can't believe you did that. You're supposed to be my friend." Even as Salgado was driving, he repeatedly swung his arm to "hit [McCoy] in the face."

Rather than driving straight to McCoy's house, Salgado pulled over at a 7-Eleven. Salgado demanded that McCoy go inside and buy him beer. Because she was still wiping blood from her nose, however, she said "no," and told him to go buy his own beer. When Salgado entered the 7-Eleven, McCoy took the opportunity to escape. She exited the vehicle, ran to a nearby stranger, and said, "I don't care where you drop me off, just get me out of this parking lot, 'cause if he comes back out, I don't know what's going to happen to me." The stranger dropped McCoy off at her friend's house. Additional friends arrived and took her back to Salgado's house to retrieve her vehicle, where she learned that the glass to her windshield was broken and the two side-view mirrors were damaged. She then went to the hospital where she discovered that she had fractures to her right eye socket and her left wrist. At the time of trial, McCoy still suffered "extensive nerve damage" to the right side of her face.

Zelaya-Otero confirmed that on the night of the offenses Salgado engaged in a fight "with another individual" in the front yard of the house. He stated that McCoy stayed inside the house the entire time and did nothing to encourage or discourage the fight. After the fight ended, Salgado and McCoy immediately began arguing and eventually went to Salgado's bedroom. Zelaya-Otero opened the door to the bedroom twice to instruct them to stop fighting and then finally asked them to leave. About twenty-five minutes after the couple left the house, Zelaya-Otero observed Salgado

outside in front of the house, and he saw Salgado break the windshield and the side mirror on McCoy's car.

After the Commonwealth rested, Salgado moved to strike the evidence as insufficient to prove malicious wounding or destruction of property. As for the malicious wounding charge, Salgado argued that the evidence failed to prove the element of malice because he was acting under a heat of passion. As for the destruction of property charge, he argued that too much time elapsed between when Zelaya-Otero saw Salgado break the glass on McCoy's car and when McCoy observed the damage. He suggested that the severity of the damage could have been caused by intervening factors. The trial court denied the motion to strike on both offenses.

Salgado testified that he texted McCoy simply to request that she bring him his mail. He stated that when she arrived at his house, she did not have his mail and kept looking out of the window. She then announced that Lucas and Bonillo were there and went to open the front door. His roommate also told him that two men were at the door looking for him. Salgado "got scared," and felt "anxious." He then went to the door and, upon encountering Lucas, told McCoy "you need to leave with him now, 'cause I don't want no problem in my house." Salgado explained that as soon as he finished saying those words, Lucas punched him in the face, breaking his glasses and cutting his eye. Salgado wrestled with Lucas and eventually landed on his back in the front yard. Lucas was on top of Salgado for about 15 to 20 seconds before Lucas was suddenly "just off of [him]." Salgado said he stood up, collected his glasses, and walked back inside the house and to his bedroom.

In the bedroom, Salgado was surprised to see McCoy sitting on his bed and asked her, "You haven't left yet?" He was not yelling at that point, but he "was really upset." He believed from the events that took place that McCoy was responsible for Lucas being at his house to fight. He thought she had organized the whole scenario. Salgado testified that he asked her, "This is what you wanted

to see . . . [to] get me beat up by [Lucas]?" McCoy responded, "Yes, you deserve more than that," and attacked him. He held her wrist so she could not head-butt him, but she was able to connect with his forehead and she scratched, bit, and slapped him. After Zelaya-Otero entered the room the first time, Salgado again asked her the same questions about Lucas, but she repeatedly denied having anything to do with why Lucas was at the house and slapped him once more. Salgado explained that her actions "set [him] off," and his instinct was "self-defense," which caused him to act. He then struck her, admittedly causing the injuries to her face. Then, when Zelaya-Otero again entered the room and told them to leave, Salgado told McCoy he would take her home. He testified that she went willingly to his car and entered it without protest. He conceded that she at first entered the back seat, but then she moved to the front seat of her own accord. He also admitted that he drove to the 7-Eleven and went inside to get a drink. Upon his return, McCoy was gone. From there, he went to his girlfriend's house and they drove to Colonial Beach. He denied returning to Zelaya-Otero's house and he denied breaking the windows on McCoy's vehicle.

Salgado renewed his motion to strike, again arguing that the evidence failed to prove he acted with malice or felony destruction of property. As for destruction of property, he argued,

> I will concede that even if the Court does agree with this motion, I don't believe that it would warrant the charge being dismissed entirely, but I do believe that [the court] should, at the very least strike any reference to the dollar value, which would then make the charge a misdemeanor as opposed to a felony.

As for malicious wounding, Salgado again argued that he acted in a fit of rage prohibiting a finding of malice. The trial court convicted Salgado of malicious wounding and reduced the felony destruction of property charge to a misdemeanor. Salgado noted this appeal.

ANALYSIS

## I. Malicious Wounding

The malicious wounding statute provides:

> If any person maliciously shoot, stab, cut, or wound any person or by
> any means cause him bodily injury, with the intent to maim,
> disfigure, disable, or kill, he shall, except where it is otherwise
> provided, be guilty of a Class 3 felony.  If such act be done
> unlawfully but not maliciously, with the intent aforesaid, the offender
> shall be guilty of a Class 6 felony.

Code § 18.2-51.  Salgado asserts that the trial court erred by finding that the evidence was sufficient to support his conviction for malicious wounding.  Specifically, he argues that the evidence was insufficient to support a finding of malice and that the trial court could only have found that he acted with unlawful intent.  This Court disagrees.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021)).  "[T]his Court will not replace the ultimate judgment of the factfinder with its own." *Durham v. Commonwealth*, ___ Va. ___, ___ (Aug. 1,2024).

"Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Shaw v. Commonwealth*, 79 Va. App. 485, 506 (2024) (quoting *Bell v. Commonwealth*, 11 Va. App. 530, 533 (1991)).  It is "evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)).  Malice "may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).  An "assault with a bare fist may be attended with such circumstances of violence and

- 7 -

brutality that [malice] may be presumed." *Id.* (alteration in original) (quoting *Fletcher v. Commonwealth*, 209 Va. 636, 640 (1969)).

Salgado attributes his purported lack of malice to the fact that Lucas came unannounced and uninvited to his home, started a fight, wrestled him to the ground, and punched him in the face. He claims he became enraged by his *suspicion* that McCoy planned the attack and, therefore, that the resulting attack upon McCoy was driven by a heat of passion. He asserts his lack of malice is evinced by the fact that immediately after the fight he started yelling at McCoy, that he did not stop yelling at her throughout the beating, and that he used only his bare fists. He claims that the beating was not attended with sufficient force or violence to indicate the presence of malice. Salgado reasons that he had neither the time nor opportunity to reflect upon his actions or that, despite Zelaya-Otero's continuing interference, he had time to cool off.

"[O]ver the last two centuries, 'heat of passion upon reasonable provocation' has evolved into the only currently legally recognized factor in the Commonwealth that negates malice." *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (alteration in original) (quoting *Smith v. Commonwealth*, 68 Va. App. 399, 426 (Humphreys, J., concurring), *aff'd*, 296 Va. 450 (2018)). "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Id.* (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)). "Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." *Id.* (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). "'Heat of passion is determined by the nature and degree of the provocation and may be found upon rage, fear, or a combination of both.' [It] 'excludes malice when provocation reasonably produces fear that causes one to act on impulse without conscious reflection.'" *Witherow v. Commonwealth*, 65 Va. App. 557, 567 (2015) (first quoting *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986); and then quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)). Thus, "[t]o establish that he acted under

the heat of passion, a defendant must prove that he acted after a reasonable provocation." *Alston v. Commonwealth*, 77 Va. App. 639, 649 (2023). The trial court did not err by declining to find Salgado acted after reasonable provocation.

Viewed in the light most favorable to the Commonwealth, the evidence proved that McCoy was shocked to learn that Lucas was at Salgado's house on the night of the offense and that she observed Bonillo watching the entire incident from his Jeep, which was parked in the driveway. Bonillo knew Lucas and Salgado, and he knew where Salgado lived. McCoy repeatedly denied any involvement in orchestrating the confrontation, and Zelaya-Otero testified that McCoy did nothing to encourage the fight. Rather, McCoy pulled Lucas off Salgado and told him to leave. She then approached Bonillo, slapped his face, and inquired why he brought Lucas to Salgado's house. A reasonable inference from this evidence is that Bonillo drove Lucas to Salgado's house, unbeknownst to McCoy.

Meanwhile, the record supports finding that Salgado had ample time to reflect on what had happened and to cool down or walk away—showing that he acted deliberately. *See, e.g.*, *Landeck v. Commonwealth*, 59 Va. App. 744, 759 (2012) ("If the evidence demonstrates that, during this interval, 'the accused reflected or deliberated . . . [or had] reasonable time or opportunity for cooling, then the wounding is attributable to malice and not heat of passion.'" (quoting *Miller v. Commonwealth*, 5 Va. App. 22, 25 (1987))). As McCoy spoke to Bonillo, Salgado looked for his broken eyeglasses. When outside the house, Salgado did not speak to, yell at, or strike McCoy. When he and McCoy were inside, while Salgado showed immediate signs of anger, it was not until he and McCoy were in his bedroom with the door closed that he repeatedly headbutted, slapped, and punched her until her face was bloody and she suffered bruises to her face and fractures to her eye socket and left arm. Even after Zelaya-Otera interrupted the assault the first time, Salgado continued his brutal attack until Zelaya-Otera again returned and threatened to call the police. After

McCoy cleaned her face, Salgado insulted her and stated that she deserved the beating. Salgado then tricked McCoy into leaving with him and continued to hit McCoy in the face on the way to the 7-Eleven. During the entirety of the incident, McCoy did not strike or assault Salgado and, instead, only sought her escape.

On this evidence, we cannot find that the trial court erred by rejecting Salgado's contention that he acted in response to an immediate provocation that rendered him deaf to the voice of reason or that reasonably produced rage and fear leading to his uncontrollable conduct. Contrary to Salgado's assertion, the record contains no evidence that McCoy provoked him. Rather, the evidence supported the trial court's finding that the beating Salgado inflicted on McCoy resulted from Salgado's anger over her *suspected* involvement in the fight and did not provoke him to the level "where reason does not exist." Moreover, Salgado had several opportunities to cool down and to control his angry responses, but failed to do so. Instead, he continued to demean McCoy before leaving the house and he repeatedly hit her face after they left. The trial court did not err in finding that the heat of passion defense was inapplicable here and that Salgado acted with the requisite malice supporting his conviction.

Because Salgado did not act on reasonable provocation, the trial court did not err in finding that he acted with malice, and because the evidence was sufficient to find that Salgado acted with malice, the trial court did not err in finding Salgado guilty of malicious wounding.

## II. Destruction of Property

Salgado also contends that the evidence failed to prove he was responsible for the damage to McCoy's car. He argues that because McCoy did not observe the extent of the damage to her vehicle until after she returned home from the hospital, the evidence failed to exclude the possibility that someone else had "the opportunity to cause the damage at issue."

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with "any element" of an offense, the Commonwealth may prove the defendant's identity through direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Id.* at 512-13 (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

The totality of the evidence compels the conclusion that Salgado was the person responsible for the damage to McCoy's car. Zelaya-Otero testified unequivocally that he peered through his living room window 25 minutes after Salgado left with McCoy and saw Salgado outside in front of the house. Zelaya-Otero watched Salgado strike the windshield and side-view mirror on McCoy's car. The time-frame is consistent with McCoy's testimony that as soon as they pulled into the 7-Eleven, she escaped by securing a ride to Karla's house. The damage to the car was to the front windshield and the side-view mirrors—in the same location of Salgado's strikes. These circumstances would lead a reasonable trier of fact to conclude that Salgado returned to Zelaya-Otero's house, damaged McCoy's car, and then fled the scene.

We find no merit in Salgado's contention that someone other than himself caused the damage to McCoy's car. Zelaya-Otero watched him do it, and no evidence was presented proving that anyone other than Salgado had a reason to damage the car. "[T]he Commonwealth 'need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from

- 11 -

the imagination of the defendant.'" *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)). The trial court did not err in finding the evidence sufficient to prove that Salgado caused the damage to McCoy's vehicle.

CONCLUSION

The evidence presented at trial was sufficient to prove that Salgado's actions were malicious, and that he was the person responsible for the damage to McCoy's car. Salgado's convictions are affirmed.

*Affirmed.*