COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia

PRINCESS JAIDYN ISLEY-WHITE

v.      Record No. 0195-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE MARY GRACE O'BRIEN
JUNE 10, 2025

FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Edward K. Stein, Judge

Daniel E. Mowry (Nelson, McPherson, Summers & Santos, L.C., on
brief), for appellant.

Sandra M. Workman, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Princess Jaidyn Isley-White (appellant) was the babysitter of two-year-old B.L.S., who was

found unresponsive and severely injured after being in appellant's care. Following a bench trial,

appellant was convicted of child abuse causing serious injury under Code § 18.2-371.1; causing

cruelty or injury to a child under Code § 40.1-103; and aggravated malicious wounding under Code

§ 18.2-51.2. On appeal, she contends that the court erred in finding sufficient evidence to support

the convictions. For the following reasons, we affirm.

BACKGROUND

We review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Konadu v. Commonwealth*, 79 Va. App. 606, 610 n.1 (2024) (quoting

*Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). This "requires us to 'discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Womack v. Commonwealth*, 82 Va. App. 289, 292 n.1 (2024) (quoting *Konadu*, 79 Va. App. at 610 n.1).

On July 14, 2022, Antonio Smith (Antonio), B.L.S.'s father, picked up B.L.S. from her daycare center. He testified that B.L.S. appeared "[p]erfect" when he picked her up and that he did not observe any injuries on the child. He explained that he brought B.L.S. to appellant for babysitting and spent "two to three hours" at the house with them. Elizabeth Smith, B.L.S.'s maternal grandmother, had dropped off B.L.S. at the daycare center that morning, and she testified that she did not notice any injuries or abnormal behavior. She reported that when she picked up Antonio from appellant's residence later that day, B.L.S. "looked great[;] . . . she didn't seem like there was anything wrong."

B.L.S.'s daycare teacher confirmed that B.L.S. had been "[h]er sweet self, just laughing, playing[,] and . . . acting her normal self" on July 14 and that Antonio picked up B.L.S. around 3:00 p.m. that day. She reported that at that time B.L.S. had no visible injuries.

B.L.S. stayed overnight with appellant. After Antonio left on July 14, appellant sent him pictures of B.L.S. throughout the evening and the next morning. B.L.S. appeared healthy and happy in all the pictures. On the afternoon of July 15, Elizabeth Smith told Antonio that appellant had called and said she could not wake B.L.S. up. He testified that, when they got to appellant's residence, B.L.S. was unresponsive and no one had called 911. Antonio and Elizabeth Smith called 911. At trial, Elizabeth Smith explained that it looked like B.L.S. was experiencing a seizure, and Antonio "thought she was dead."

In response to the 911 call, a paramedic went to appellant's residence at 5:27 p.m. and found B.L.S. in Elizabeth Smith's arms, "nonresponsive to verbal and painful stimuli," but breathing. He

observed "[b]ruising around the left ear[,] [h]ematoma above the eyes[,] and also an abrasion under the chin and . . . the right arm." He alerted the police department that he suspected child abuse.

Deputy B. McGuire, a Covington police officer, assisted at the scene. He reported that appellant did not explain what had happened and that she later stated only that "she had laid [B.L.S.] down for a nap[,] and [B.L.S.], when she woke up, wasn't acting correctly."

In the ambulance on the way to the emergency room, Antonio called appellant, asking whether she had left B.L.S. at any point or if anyone else was at the house, which she denied. While at the hospital and later the trauma center, appellant continued to contact Elizabeth Smith, writing in one text that "[B.L.S.] hasn't done anything today but eat, play[,] and sleep."

Upon B.L.S.'s arrival, the emergency room physician, Dr. Gregory Lamb, observed "bruising on the forehead and then mostly on the left side right around the ear" as well as scratches on B.L.S.'s lip and right hand. B.L.S. experienced seizures while in Dr. Lamb's care, and her general condition deteriorated: "her heart rate slowed" and "she became hypoxic[,] and she started posturing"—an indication of neurological injury. The medical team had to resuscitate her and inserted a breathing tube to protect her airway. B.L.S.'s condition was life-threatening, and she had to be airlifted to the closest trauma center. Dr. Lamb testified that B.L.S. "had an acute subdural hematoma and . . . a chronic subdural hematoma, nonaccidental trauma and traumatic brain injury with herniation," and "a possible skull fracture."

Dr. Tad Schoedel, a board-certified ophthalmologist, examined B.L.S. after she was transferred to the trauma center. He found "[20] to [25] inter-retinal and sub-retinal hemorrhages . . . expanded along all the blood vessels and in all four quadrants of the retina." Dr. Schoedel opined that the pattern of the hemorrhages indicated nonaccidental head trauma because when the "head accelerates and decelerates enough that it can shear different layers of the retina" it will cause hemorrhages in all four quadrants of the retina.

At trial, Dr. Schoedel stated that he usually did not see these injuries in minor accidents and retinal hemorrhages occurred only in "about three to five percent" of accidents. He further explained that the bilateral nature of the hemorrhaging reflected "abusive head injuries." He concluded that B.L.S.'s injuries were likely caused by nonaccidental trauma because no other causes, such as a "high[-]speed motor vehicle accident, like a very high fall, . . . leukemia," or "optic disc edema," were known.

B.L.S. underwent surgery and remained in the hospital for a month. She later required readmission for another 30 days for several more surgeries. B.L.S. now "has a prosthetic skull," a "horse[-]shoe shaped scar on . . . the side of her head," and two permanent shunts, one along her neck and another in the front of her chest, which is visible.

Deputy McGuire interviewed appellant at the emergency room on July 15. Appellant explained that she had been alone in the house with B.L.S. and her two-year-old son that day, after her fiancé had left around 11:00 a.m. In her written statement, appellant described the day, explaining that B.L.S. and her son had lunch "until around 10:30-10:45 [a.m.]," she gave them a bath, and they "went outside and they played for about [1.5]-2 hours." Appellant brought the children inside for a nap; she was later unable to wake B.L.S. Appellant showed Deputy McGuire pictures taken throughout July 14 and the morning of July 15 to demonstrate that B.L.S. "was okay . . . with no injuries." She maintained that she did not injure the child. Later, appellant claimed that Antonio had caused the bruises. At no point during the interview did appellant mention that B.L.S. had vomited multiple times while in her care.

Special Agent Susan Drees-Armstrong also interviewed appellant on July 15. During that interview, appellant stated that "obviously somebody hurt this child," but she insisted that nothing happened to B.L.S. while in her care. Appellant again did not say anything about B.L.S.'s vomiting.

Appellant agreed to a search of her residence, during which police officers took pictures and measured the furniture. They found several pieces of "extremely soiled" children's clothing that "had the odor of vomit," and they reported that the bed had no sheets on it and the "bedclothing was in the wash[ing] machine, damp to the touch." The police officers also recovered a child's backpack that contained clean clothing, wipes, shoes, and diapers.

Appellant gave a second statement to Agent Drees-Armstrong on July 16 at 12:33 in the morning, while the police searched her house. Responding to the question whether B.L.S. had thrown up that day, appellant denied that B.L.S. had thrown up while in her care and stated that the "throw-up cloths were brought to her in a backpack[,] and she was asked to wash them" by Antonio. Appellant did not ask about how B.L.S. was doing at any time during the interview, and Drees-Armstrong took appellant's phone to download the contents.

After that, at 3:10 a.m. the next morning, appellant sent Agent Drees-Armstrong an email, stating that she was "not covering for Tony [Antonio] or Libby [Elizabeth] anymore" and that "YES, [B.L.S.] was throwing up but only three or four times." She further claimed that Antonio had asked her not to tell anyone about B.L.S. throwing up and having "bruising on her butt." The police later recovered text messages between appellant and her fiancé, from the seized phone, where appellant discussed B.L.S. throwing up multiple times on July 15.

At trial, Agent Drees-Armstrong testified that, throughout her conversations, appellant insisted that B.L.S. never had contact with anyone besides herself and nothing happened that could explain the injuries. Appellant also said that "she understood [B.L.S.'s injuries] happened in her care" and that "she takes full responsibility for having her." Appellant made several inconsistent statements to Agent Drees-Armstrong about where and what time B.L.S. threw up while in her care, at one point saying she threw up before playing outside, while other times saying she threw up afterwards, and another statement that it was during their time outside. Appellant also gave

inconsistent statements regarding what time they went outside to play, at various times saying it was after 11:00 a.m., 12:00 p.m., almost 2:00 p.m., and 1:00 p.m.

Antonio testified that he had never seen B.L.S.'s injuries before and that he did not cause the injuries or know who did. He also denied packing any soiled clothes in B.L.S.'s backpack or asking appellant to wash the clothes. Finally, Antonio reviewed the pictures appellant had taken of B.L.S. and noted that B.L.S. appeared unharmed and healthy in all of them—the final picture showed B.L.S. in a highchair, eating around 10:45 a.m. on July 15.

Dr. William Boyd, B.L.S.'s pediatrician, testified that B.L.S. had a normal birth, reached every developmental milestone, and had no history of head trauma or any other major condition. Overall, she was "a normal, healthy child."

Dr. Robin Foster, a professor and physician board-certified in pediatrics, pediatric emergency medicine, and child abuse pediatrics, was qualified as an expert in child abuse pediatrics. She testified that the term "abusive head trauma" describes "patterns of injuries that occur in nonaccidental head trauma." Signs of abusive head trauma include vomiting, nausea, "not feeding once the injury occurs," and neurological symptoms such as "irritability, fretfulness, crying, sleeping more, diminishing state of consciousness to the point of coma." Further, an affected child may have issues breathing and "manifest seizures secondary to the damage." Symptoms also include "extra axial blood on the brain" for 99% of children, "retinol [sic] hemorrhages that are multi-layer, multi-quadrant, frequently bilateral" for 85% of children, "some type of . . . altered mental status in terms of interactiveness and responsiveness" in all cases, and "brain tissue damage" in some. Possible soft tissue injuries include bruising and scratches.

Dr. Foster reviewed B.L.S.'s medical records and subsequently opined that B.L.S. had likely suffered abusive head trauma. She summarized B.L.S.'s injuries, explaining that B.L.S. had bruising on all sides of her head, as well as on the side of her right elbow and on her hand. B.L.S.

also "had a large left sided subdural hematoma" that "actually push[ed] the lefthand side of the brain over onto the righthand side," which required drainage. She further suffered multiple hemorrhages in the brain tissue and "damaged . . . , oxygenated blood flow" causing parts of B.L.S.'s brain tissue to die, permanently changing the "architecture" of her brain. Dr. Foster shared Dr. Schoedel's opinion that the retinal hemorrhages were a "classic finding[] for abusive head trauma patients" caused by "the mechanism of . . . acceleration, deceleration" force.

Dr. Foster opined that, because B.L.S. had "no underlying medical diagnosis" showing predisposition to or history of head trauma, the "constellation of findings" was "consistent with abusive head trauma." She further stated that a child "injured with the severity of injuries that [B.L.S.] had" would be "symptomatic from the time that injury happened." She explained that vomiting was a symptom of these injuries and that B.L.S.'s skull fracture was also consistent with "impact trauma," meaning "something hit her[,] or she hit into something hard." Similarly, B.L.S.'s soft tissue injuries around the ear and on opposite sides of her head were indicative of physical abuse. According to Dr. Foster, the fact that B.L.S. had been engaged in normal activities on July 14 and 15 meant that B.L.S. was not injured before coming into appellant's care. Finally, Dr. Foster excluded a short fall as a possible source of B.L.S.'s injuries.

Appellant moved to strike, arguing that the Commonwealth failed to identify any act or omission constituting child neglect and endangerment. The court denied the motion.

Appellant then called Dr. Joseph Scheller, a board-certified pediatric neurologist, as an expert in "results of the medical records and CAT scans." During voir dire, Dr. Scheller acknowledged that he was not board-certified in child abuse pediatrics, had never been part of a team assessing child abuse, and had never testified for the prosecution. He further stated that he did not believe abusive head trauma was "a valid or helpful or meaningful diagnosis" even though the "majority of the medical community . . . acknowledges [the] diagnosis."

Dr. Scheller opined that B.L.S.'s symptoms stemmed from "an accidental injury." He stated that a short fall can cause subdural hematoma and that retinal hemorrhages "happen[] whenever that system of circulation is under pressure," meaning they did not indicate abusive head trauma. Similarly, he did not believe that the injuries resulted from shaking, believing B.L.S. to be too heavy to be violently shaken by appellant, who was pregnant at the time. Dr. Scheller could not identify the date of B.L.S.'s injuries because it was not possible to say whether the brain bleeding was happening at a quick or slow pace. He believed that B.L.S. "would have been functioning normally." Finally, Dr. Scheller opined that "acceleration and deceleration is just not at all important" because it could not cause a subdural hematoma "without impact," such as hitting the head on something.

At the end of the case, the court made several factual findings in its ruling. It stated that "it makes absolutely no sense" for appellant to "withhold[] the fact that the child has been vomiting since 10:30 that morning and there is really no reason for her to have done that other than that was evidence of her own guilt." The court pointed out that appellant's claim that Antonio asked her not to say anything "makes no sense because we have communications" between them showing that Antonio asked about what happened. Further, the court emphasized that "[appellant's] own statements preclude the idea of an accident." Specifically, it found that when appellant said, "I'm there the entire time. I'm watching this child. The child did not fall, was not hit, did not have an accident" then the "only other conclusion is that it was intentional." The court also determined "that Dr. Foster's testimony is much more credible than Dr. Scheller's testimony in all aspects." Accordingly, the court convicted appellant of the three felony offenses.

ANALYSIS

I. Standard of Review

"In reviewing the sufficiency of the evidence on appeal, this Court will affirm the decision unless the judgment was plainly wrong or the conviction lacked evidence to support it." *Drexel v. Commonwealth*, 80 Va. App. 720, 747 (2024). "In conducting this review, the 'appellate court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."'" *Id.* (quoting *Commonwealth v. Barney*, 302 Va. 84, 97 (2023)). Instead, "the relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010). "[W]hile no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (second alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

"[T]he evidence supporting a conviction must 'exclude every reasonable hypothesis of innocence' that flows from the evidence." *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "[W]hether an 'alternative hypothesis of innocence is reasonable is a question of fact' that will be reversed on appeal only if plainly wrong." *Id.* (quoting *Stevens v. Commonwealth*, 38 Va. App. 528, 535 (2002)). "Importantly, '[t]he hypotheses [of innocence] which must be thus excluded are those which flow from the evidence itself, and not from the imaginations of defense counsel.'" *Commonwealth v. Wilkerson*, __ Va. __, __ (Feb. 20, 2025) (alterations in original) (quoting *Cook v. Commonwealth*, 226 Va. 427, 433 (1983)). "[T]he 'pertinent question' on appeal is 'whether a rational factfinder, in light of all the evidence, could have *rejected* [appellant's] theories of innocence and found him guilty beyond a reasonable doubt.'" *Id.* at __ (quoting *Moseley*, 293 Va. at 464). "Where factual

- 9 -

findings are at issue in the context of an appeal, great deference is given to the trier of fact, in this case the trial court." *Thorne*, 66 Va. App. at 253.

## II. Sufficiency of the Evidence

Appellant contends that the court erred in finding sufficient evidence to convict her of child abuse causing serious injury and torture or cruel treatment of a child because the Commonwealth failed to prove "any act or omission of [appellant] to cause injury to the child." Appellant further argues that B.L.S.'s injuries could have resulted from an accident and that the Commonwealth failed to establish how the child's injuries were caused.

Code § 18.2-371.1 and Code § 40.1-103 respectively provide:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the life of such child to be endangered or the health of such child be injured, . . . or to cause or permit such child to be overworked, tortured, tormented, mutilated, beaten or cruelly treated.

The term "willful" means "an act which is intentional, or knowing, or voluntary, as distinguished from accidental." *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999) (quoting *Snead v. Commonwealth*, 11 Va. App. 643, 646 (1991)).

When reviewing the sufficiency of the evidence, an appellate court does not "distinguish between direct and circumstantial evidence." *Barney*, 302 Va. at 98 (quoting *Moseley*, 293 Va. at 463). "Indeed, in some cases circumstantial evidence may be the only type of evidence which can possibly be produced." *Id.* (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "[W]here it appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was [the] sole custodian of the child during that period may be

sufficient, standing alone, to prove criminal agency." *Collado v. Commonwealth*, 33 Va. App. 356, 364 (2000) (first alteration in original) (quoting *Christian v. Commonwealth*, 221 Va. 1078, 1082 (1981)).

"Determining the credibility of the witnesses and the weight afforded their testimony are matters left to the fact finder, who has the ability to hear and see them as they testify." *Thorne*, 66 Va. App. at 253.

The court found that appellant's statements concealing B.L.S.'s repeated vomiting while in her care were "evidence of her own guilt." Similarly, appellant's insistence that she was the only adult with B.L.S. and did not observe any accidents effectively negated her "accident" theory of defense and meant that "the only other conclusion" could be that the injuries were intentionally inflicted. These findings are not plainly wrong. The record reflects that appellant initially did not mention to investigators that B.L.S. had thrown up in her care and then affirmatively denied that it happened; only later did she admit lying—after the police had access to text messages on her phone where she expressed irritation with the vomiting—admitting that B.L.S. had in fact vomited while with her. She also gave inconsistent statements regarding the timeline of the events on July 15 and blamed Antonio for B.L.S.'s bruises and the soiled clothes found at her home. Because the circuit court was the fact finder in this case, its determination is given "great deference." *Thorne*, 66 Va. App. at 253. The fact finder is also free to conclude that a defendant's "false statements establish that [s]he has lied to conceal [her] guilt." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019).

Further, appellant's hypothesis of innocence appears to have been that B.L.S. was injured before being in her care. But several witnesses testified that B.L.S. was behaving normally on July 14, before she was found seriously injured and unresponsive in the afternoon of July 15. Pictures and videos confirm that B.L.S. was unharmed on July 14 and the morning of July 15. Dr. Foster

testified that B.L.S. could not have functioned normally after incurring her injuries. Additionally, by appellant's own admission, the only other adult in the house early on July 15 was her fiancé, who left around 11:00 a.m., without having any contact with B.L.S. Although admitting that "obviously somebody hurt this child," appellant insisted that she did not observe any sort of fall or accident that could have caused the injuries. A reasonable fact finder could therefore "have *rejected* [appellant's] theories of innocence and found [her] guilty beyond a reasonable doubt." *Wilkerson*, __ Va. at __ (quoting *Moseley*, 293 Va. at 464).

When the case involves two experts with conflicting opinions, this usually results in a "'a credibility battle' . . . and it is up to the fact finder to determine which expert's testimony is more credible." *Rams*, 70 Va. App. at 27.

Here, the court explicitly found that "Dr. Foster's testimony is much more credible than Dr. Scheller's testimony in all aspects." Dr. Foster gave extensive testimony, explaining the symptoms of abusive head trauma and concluding that B.L.S.'s injuries were "consistent with abusive head trauma." She also explained that, in addition to the acceleration and deceleration injuries, B.L.S.'s skull fracture was consistent with "impact trauma," while the bruises behind B.L.S.'s ears were also indicative of physical abuse. Unlike Dr. Scheller, Dr. Foster excluded the possibility that the injuries were caused by a short fall, and she did not believe that inflicting these injuries took any extraordinary strength, only "adult strength."

But Dr. Foster's testimony was not the only evidence of appellant's guilt. Dr. Schoedel, who examined B.L.S. at the trauma center, also testified that, in his opinion, B.L.S. had suffered nonaccidental abusive head trauma. This opinion was also bolstered by the fact that B.L.S. had injuries on all sides of her head, rather than a single discrete injury. Dr. Boyd, B.L.S.'s pediatrician, explained that that B.L.S. had been a normal, healthy child, who had no prior medical history that

otherwise could explain the head injuries. The court, in its role as fact finder, was entitled to believe Dr. Foster and Dr. Schoedel instead of Dr. Scheller. *See Rams*, 70 Va. App. at 27.

The fact that appellant maintained her innocence and the fact that no one directly witnessed the abuse do not make the court's finding of guilt plainly wrong. Circumstantial evidence can be enough to sustain a verdict. *See Barney*, 302 Va. at 98. The court therefore did not err in finding sufficient evidence to convict appellant of child abuse causing serious injury and torture or cruel treatment of a child.

Appellant also posits that the court erred in "finding the evidence sufficient to prove that . . . [appellant] maliciously stabbed, cut or wounded" the child "with intent to maim, disfigure, disable, or kill" under Code § 18.2-51.2.

Code § 18.2-51.2 provides:

> If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.

"[I]ntent is a state of mind that may be proved by an accused's acts or by his statements and that may be shown by circumstantial evidence." *Rodriquez v. Commonwealth*, 50 Va. App. 667, 673 (2007) (quoting *Wilson v. Commonwealth*, 249 Va. 95, 101 (1995)). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from facts that are within the province of the trier of fact." *Ellis*, 29 Va. App. at 555 (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "[T]he fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." *Fleming*, 13 Va. App. at 353 (quoting *Bell v. Commonwealth*, 11 Va. App. 530, 533 (1991)).

"Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Hernandez v. Commonwealth*, 15 Va. App. 626, 631 (1993) (quoting

*Christian*, 221 Va. at 1081). "It may be directly evidenced by words[] or inferred from acts and conduct which necessarily result in injury." *Id.* (quoting *Christian*, 221 Va. at 1081). "Whether malice existed is a question for the fact finder." *Robertson v. Commonwealth*, 31 Va. App. 814, 823 (2000).

Here, significant evidence supports the court's conclusion that appellant "maliciously . . . cause[d] injury, with the intent to maim, disfigure, disable or kill." B.L.S. was severely injured; she suffered brain bleeding and swelling, a fractured skull, several bruises and cuts, and retinal hemorrhages. She was two years old at the time, and appellant was the adult responsible for B.L.S.'s well-being. Appellant repeatedly made false statements to the police and B.L.S.'s guardians, and she tried to blame B.L.S.'s father. Although circumstantial, the evidence was nevertheless sufficient to sustain a conviction. *See Ellis*, 29 Va. App. at 555.

## CONCLUSION

Appellant's convictions were supported by evidence showing that B.L.S. was unharmed before coming into appellant's custody; she suffered abusive head trauma; appellant had sole custody and control of B.L.S.; and she made false statements to the police. Accordingly, the circuit court did not err in finding the evidence sufficient to support appellant's convictions.

*Affirmed.*